EAGLE–PICHER LEAD CO. v. FULLERTON et al. (two cases).*

FULLERTON et al. v. EAGLE–PICHER LEAD CO.

Circuit Court of Appeals, Eighth Circuit. September 21, 1928.

Nos. 7878–7880.

*Rehearing denied December 1, 1928.

Ray McNaughton, of Miami, Okl., and George S. Ramsey, of Tulsa, Okl. (Edgar A. De Mueles and Villard Martin, both of Tulsa, Okl., on the brief), for plaintiffs.

A. C. Wallace, of Miami, Okl., and A. E. Spencer, of Joplin, Mo., for defendant.

Before KENYON, Circuit Judge, and SCOTT and SYMES, District Judges.

SCOTT, District Judge. These several appeals emanate from one general controversy. The litigation was initiated in the lower court by S. C. Fullerton and W. W. Dobson filing their bill in equity against the Eagle-Picher Lead Company, an Illinois corporation, praying for the specific performance of certain contracts, the establishment of an interest in certain mineral leases held by the Eagle-Picher Lead Company, and for an accounting, and judgment for balance due. The defendant answered the bill, and, among other matters pleaded, set up fraud and deception on the part of the plaintiffs, not only in connection with the procuring of one of the principal contracts, but with respect to performance, including the failure of title under certain alleged mineral leases, and concluding the answer in the nature of a counterclaim for cancellation, accounting, and for large sums of money paid under the contract, and judgment for balance due on accounting. The plaintiffs replied to the counterclaim, and upon the issues so framed the cause was tried and decree rendered. By the terms of the decree plaintiffs were denied specific performance of one of the contracts, and denied the establishment of the interest claimed in certain mineral leases, but were allowed an accounting and a recovery as under the terms of another of the contracts. By the terms of the decree defendant was denied relief on its counterclaim, except as

to an item of overpayment of royalty on one tract of land.

From the decree as entered the Eagle-Picher Lead Company appeals, and also from an abundance of caution sued out writ of error, and docketed the case separately according to each procedure as Nos. 7878 and 7879, respectively. Fullerton and Dobson, plaintiffs below, also appeal, and their appeal is docketed as No. 7880. From an examination of the counterclaim of the Eagle-Picher Lead Company we are convinced that it states a cause of action such as might have been the subject of an independent suit in equity against the plaintiffs. There was a stipulation signed and filed to the effect that, "in the event it should be decided by the court at any time during the progress of this case that it should be or should have been transferred to the law docket, it is agreed by and between the plaintiffs and the defendant that a jury be and is hereby expressly waived, and the cause then treated as on the law docket, and the parties consent to the trial of said cause to the court without the intervention of a jury." No such event, however, occurred, and the cause was tried to its conclusion as in equity, and we think properly so, and that the cause properly comes to this court as on appeal.

It appears from the record that at the time of the transactions in question, extending back to the year 1913, Fullerton, a lawyer and former judge, residing at Miami, Okl., with whom was associated Dobson, herein referred to as the plaintiffs, was engaged in dealing in mineral land leases; that he then and theretofore had considerable acquaintance and was not without influence among the Indians of the Quapaw Tribe, members of which tribe were allottees and descendants of allottees of mineral lands. The Eagle-Picher Lead Company was and is an Illinois corporation, with principal place of business at Chicago, and was the successor of a Missouri corporation named the Picher Lead Company, of which O. S. Picher was president. The Picher Lead Company, and later the Eagle-Picher Lead Company, were engaged in the development of mineral lands, particularly lead and zinc lands, and in manufacturing and reducing ore, as well as leasing and subleasing mineral lands.

On October 10, 1913, the said S. C. Fullerton and O. S. Picher entered into a contract which, after reciting the fact that the second party (Picher) had recently taken leases for mining purposes on various tracts of land in the Miami, Okl., mining district described as parcels 1 to 12, inclusive, and most of which leases being made to the second party by the first party (Fullerton), contained an undertaking by the first party that he would, during the life of the leases, procure renewals of the leases to the first party, or to the person leasing such land to the second party, or an extension of the terms of such lease, or a new lease or leases, upon the land described in the original lease, or any part thereof, and that the first party would notify the second party, his successors, heirs, or assigns, in writing, of such renewal extension or new lease, and of the terms and conditions thereof, and thereupon second party, his successors or assigns, should have the exclusive option for a period of 30 days to take such renewal extension or new lease at an increased royalty of 2½ per cent. above the royalty reserved in the new leases, and, in case of extensions or renewals of existing leases, then at the royalties payable by second party in his present lease. The first party further undertook that, if during the life of the original leases to second party, or any extensions or renewals or new leases on the same land, he should procure mining leases on any other tracts on the Quapaw Indian reservation, he would in such instance notify the second party, his successors or assigns, in writing, and that a like option should obtain to take the lease at a royalty of 2½ per cent. above the royalty provided in the lease to first party. The parties operated under this contract without modification until April 8, 1915. Under this contract Fullerton subleased certain of the lands in controversy to Picher, particularly the Slim Jim and Sin-tah-hah-hah allotments. Other tracts were subleased, or leases procured by Fullerton and taken directly to Picher. On April 8, 1915, a new contract was entered into between Fullerton and Picher, terminating and canceling and becoming a complete substitute for the contract of October 10, 1913.

The contract of April 8, 1915, similarly to the previous contract, recited that second party had recently taken leases for mining purposes on various tracts of land in Miami, Okl., mining district, said leases being made by first party to second party, and described 13 separate parcels of land, each parcel being under a separate lease. The contract then recited the consideration of $5 and other valuable consideration, and the agreement that, if the first party should, during the life of any of the leases mentioned, procure as to the land described in such lease, or any part thereof, a renewal of the lease to the first party, or to the person leasing such land to

second party, or an extension of term or new lease upon the land described in the original lease, the first party should notify second party, his successors or assigns, of such extension renewal or new lease, and an option similar to that reserved in the contract of October 10, 1913, was given.

The contract of April 8, 1915, contained the further provision that the second party, in consideration of the agreement, bound himself, his representatives and assigns, to account for and pay to first party a royalty of 2½ per cent. of the market value of all ores produced and sold from four particularly described parcels of land, indicated herein as parcels A, B, C, and D. The contract further contained the proviso that, before the second party should be required to pay the first party any money to accrue from such 2½ per cent. royalty, he shall repay to himself from such sum of money as he shall have paid as a bonus to acquire the mining rights to the tract or tracts or parcel of land from which such royalties accrue; such bonus to include any sums of money expended in litigation, or otherwise, to establish his right to mine any tract described as A, B, C, and D. The foregoing four parcels were ones upon which Picher had procured leases without the aid of Fullerton, but Picher, in consideration of the 1915 contract, put them in with the others, and was allowing Fullerton and his associate a 2½ per cent. royalty on them. It may be here stated that Picher in all of ·these matters was acting for the use and benefit of the Picher Lead Company, the Missouri corporation, of which he was president, and Fullerton was acting for himself and for Dobson. Shortly after the execution of the 1915 contract the Eagle-Picher Lead Company was organized under the laws of Illinois, and became the successor to the Picher Lead Company as to all the mining leases in question.

Following the execution of the 1915 contract, Picher and the Eagle-Picher Lead Company began extensive prospecting operations on some of the tracts of land described in that contract, and expended several hundred thousands of dollars in so doing, erected mills for the reducing of ore, and operated in that respect for a number of years. Among the parcels prospected, and upon which rich bodies of ore were discovered and worked by the Eagle-Picher Lead Company, were the Slim Jim and Sin-tah-hah-hah allotments. Others of the parcels of land were divided and subleased by the Eagle-Picher Lead Company to various mining operators who prospected, discovered, and worked mines. During the period of operation the Eagle-Picher Lead Company paid to Fullerton and his associate, from the 2½ per cent. royalties, sums approximating $200,000, and Fullerton procured renewals of the leases to himself on parcels 1 and 2, described in the 1915 contract, to expire in 1929. These renewals Fullerton retained, and never assigned or otherwise transferred their terms to the defendant.

On December 20, 1920, the Eagle-Picher Lead Company having succeeded to the rights of Picher and the Picher Lead Company as stated, entered into a third contract with S. C. Fullerton and W. W. Dobson wherein it is recited: "Whereas the parties hereto have heretofore been interested in mining leases on certain tracts of land herein described, and are now contemplating the extension of the lease period on said lands, it is agreed as follows, to wit: That the lands covered and affected by this contract will hereinafter be described and referred to by parcel number as follows, to wit: [Then follow 19 separately numbered parcels of land.]"

Most of these lands are the same as contained in the 1913 and 1915 contracts, although the parcels are not in all instances identical. Some of the parcels carried into the 1920 contract are divided and given separate numbers, and some additional parcels are included. The Slim Jim allotment, and the Sin-tah-hah-hah allotment, involved in both of these appeals, are carried into the 1920 contract as parcels numbered 7 and 8 respectively. Parcels A, B, C, and D of the 1915 contract are carried into the 1920 contract as parcels numbered 3, 16, 19, and 18, respectively. The descriptions of parcels numbered 1 and 2 of the contract of 1915 also appear as parcels numbered 1 and 2 in the contract of 1920. The west half of the northwest quarter of section 36, township 29 north, range 22 east, does not appear in either the 1915 or the 1920 contracts. However, it appears that on May 27, 1922, Fullerton obtained a lease from Newaukais Hampton, née Quapaw, covering the entire northwest quarter and northeast quarter of the southwest quarter of said section 36. And Fullerton also on February 10, 1920, had obtained a lease from Ta-meh-heh Quapaw covering parcel No. 2. These last two are the leases which Fullerton withheld.

The contract then, after pledging co-operation of parties in securing the renewals, contains the following general provisions:

"The parties shall co-operate, to the end that the present leases on said lands shall

be extended or new leases taken at a royalty of not to exceed seven and one-half per cent. (7½%) to the owner of the land, and except as hereinafter provided, in the event that extensions or renewals are secured at a royalty of seven and one-half per cent. (7½%), the parties of the second part shall be entitled to have and receive from all ores and minerals mined or produced under such extension, a royalty of three and one-half per cent. (3½%), and, if said leases are renewed at a royalty greater than seven and one-half per cent. (7½%), then and in that event the parties of the second part shall be entitled to have and receive for their interest in said extension, one-half (½) of the difference between the royalty required to be paid to the owner of said land in said new lease or extension and fifteen per cent. (15%), in lieu of said three and one-half per cent. (3½%) as aforesaid, the foregoing assuming that the leases are taken in the name of the party of the first part.

"In the event the lease or extensions are taken in the name of the parties of the second part, or either of them, then and in that event, the parties of the second part agree to grant the party of the first part their full period of such extension at a royalty of eleven per cent. (11%) in the event said extensions are procured by them at a royalty of seven and one-half per cent. (7½%), and if procured at a greater royalty than seven and one-half per cent. (7½%), such extensions or new leases shall be granted to first party at an advanced royalty equal to one-half (½) the difference paid by second parties and fifteen per cent. (15%)."

The contract then provided for a slight reduction of royalty payable to Fullerton and Dobson on certain particular tracts for the unexpired term of the existing leases in case of renewals or extensions, and provided a flat royalty for the balance of the term of the new leases; the reduction for such unexpired terms of existing leases to be effective only in case of such renewals or extensions. It is further provided that the settlements and adjustment of interest on the several tracts shall not become effective, except upon the renewal of the lease on the particular tract, and in the event of failure to renew on any particular tract, or procure an extension, the status of the parties as to such tract should remain the same as provided for in the contract of April 8, 1915. The contract provides for the keeping of books on each tract, and the making of reports and payment of royalties, and that, in case any tract upon which a renewal or extension is pro-

cured shall be subleased by said first party, and a royalty of 7½ per cent. or more reserved to the first party, then such reserved royalty shall be apportioned on the basis of 3½ per cent. to Fullerton and Dobson, and 4 per cent. to the Eagle-Picher Lead Company. The contract then recites the obtaining of the leases by the second party on parcels 1 and 2, and the second parties agree to execute a sublease to the first party at a royalty of 12½ per cent., independent of any reductions, extensions, or renewals provided for therein.

The original leases referred to in the contracts of 1913 and 1915 had been procured by Fullerton from the Indians on a basis of 5 per cent. royalty to the Indian landowner. It will be observed that the contract of 1920 allowed for renewals and extensions on a basis of not to exceed 7½ per cent. to the landowner. Following the execution of the 1920 contract, the parties proceeded to obtain seven mining leases running to the Eagle-Picher Lead Company, lessee, and were made subject to the approval of the Secretary of the Interior. The lands in question were restricted Quapaw lands, and after the execution of the 1915 contract as authorized by an act of Congress, the Secretary of the Interior had declared all of the Quapaw Indians in question incompetent, and all leases were required thereafter to be approved by the Secretary of the Interior. Most of these seven leases reserved to the Indian landowner a royalty of 5 per cent. of the gross proceeds of all lead and zinc ores extracted from the land from the date of the approval thereof to the date of the expiration of the existing lease, and thereafter during the remainder of the term the sum of 7½ per cent. of such gross proceeds. One or two of these leases reserved a flat royalty of 5 per cent. to the Indian landowner throughout the term.

On February 17, 1921, the defendant through its counsel, Mr. Wallace, transmitted these leases to the Superintendent of the Quapaw Agency, and he in turn transmitted the same to the Secretary of the Interior for approval. Hearings were had before the Commissioner of Indian Affairs, Fullerton and Dobson filed a brief in support of the application of the leases, and both plaintiffs and defendant appeared by counsel and urged their approval. Upon full consideration the Secretary of the Interior determined that the royalties reserved to the Indian landowners were inadequate, that the lands were of such value as to justify the reservation of a royalty to the landowner of 15 per cent., and approval of the leases was refused. At the

hearing before the Commissioner of Indian Affairs the relation of the Eagle-Picher Lead Company and Fullerton and Dobson was fully disclosed, and their contracts made known. The officials of the Interior Department acting in the premises were not disposed to entertain proposals for the leasing of these lands at a royalty that would permit the carrying of Fullerton and Dobson for a share. It was stated at the hearing that the department felt that plaintiffs had been amply repaid for any investment theretofore made on the leases, and that the department was not in a position to hand out any further gratuities to them. This hearing was held on February 26, 1921, and the Commissioner of Indian Affairs communicated his conclusions to the Secretary of the Interior by letter of May 20, 1921, and the conclusions were on May 30, 1921, approved by the First Assistant Secretary.

On October 1, 1921, the Eagle-Picher Lead Company, by J. B. Swift, its president, wrote a letter to Messrs. Fullerton & Dobson, addressed to Miami, Okl., in which he refers to the opinion of the Commissioner of Indian Affairs of May 20, 1921, and stated:

"We have hoped that the department might reconsider its decision of May 20, 1921, so that the relation heretofore existing between us and as contemplated by the agreement, might be continued indefinitely. However, it appears to us now, from the utterances of different members of the department, that the decision of May 20, 1921, is final. If this be true, it is our opinion that the agreement of December 20th, has served its purpose and the status of the parties is now as it was before the execution of this agreement. We are of the opinion that this is both the spirit and letter of the agreement, and particularly so in view of the following quoted paragraph:

" 'It is further agreed and understood by and between the parties hereto that the settlements and adjustments of interests as provided herein on the several tracts shall not become effective, except upon the renewal or extension of the lease or contract on such tract, and in the event of failure to renew any particular tract or to secure an extension thereon, the status of the parties as to such tract shall remain as it now is.' "

The letter then refers to certain statements of the department officials and continues:

"The company feels that, in view of its investment in the district, it should not leave any stone unturned to protect this investment, and having this in mind, and being of the opinion that the agreement of December 20, 1920, has been nullified by the action of the department in refusing to approve the leases submitted pursuant to this contract, it will be the future policy of the company to endeavor to procure extensions or new leases for its exclusive use and benefit on such lands as may be available for re-leasing."

Fullerton replied to this letter, declining to accede to the position of the Eagle-Picher Lead Company as above stated. Following the rejection of the applications for approval of the leases jointly submitted, and the occurrences just related, the lands were advertised for leasing, and plaintiffs and defendant as competitors bid against each other, but the various bids were rejected, and on June 29, 1922, the Secretary of the Interior promulgated a schedule or proposal of conditions for leasing the said allotments, and the plaintiffs and defendant again competed. The Eagle-Picher Lead Company was declared the successful bidder, and leases were awarded to it, and executed and delivered with the approval of the Secretary of the Interior as of August 1, 1922, on all six allotments, including the Sin-tah-hah-hah and Slim Jim allotments. Following the execution and approval of the aforesaid leases, the exact date does not appear in the record, but some time before July 24, 1923, plaintiffs Fullerton and Dobson began this suit in the district court of Oklahoma in and for Ottawa county, and the cause was thereafter, on July 24, 1923, removed into the District Court of the United States for the Northern District of Oklahoma.

At this point we should deal with the issues with somewhat more particularity than in the general statement heretofore made. Plaintiffs in their petition plead in substance the terms and also exhibit the three contracts of 1913, 1915, and 1920 hereinbefore described. Plaintiffs also allege the procuring of the leases upon the tracts of land specified in the 1913 and 1915 contracts, and the possession of the defendant and the defendant's predecessors thereunder. Plaintiffs then further allege with respect to parcel No. 4, known as the Harry Crawfish allotment, parcel No. 12, being 40 acres of the Mary Whitebird allotment, and parcel No. 18, being part of the allotment of Mary Whitebird, that defendant on August 1, 1922, obtained from O. K. Chandler, Superintendent of the Quapaw Indian Agency, new leases executed by said Chandler in behalf of the Indian owners of the lands, for lead and zinc mining purposes for terms of 10 years, which

leases were approved by the Secretary of the Interior on September 6, 1922; that said leases were executed by defendant as lessee, and accepted by it as lessee, and that said lands were being operated and mined for lead and zinc, and lead and zinc sold and marketed therefrom since the effective date of said leases, and that defendant, although requested and demanded by the plaintiffs so to do, has failed and refused to account to the plaintiffs for 1 per cent. of the lead and zinc ores mined and sold from parcels Nos. 4 and 12, and 1½ per cent. from parcel No. 18, as provided for in the 1920 contract, and shown by said respective leases.

Plaintiffs further allege that on October 10, 1913, the said Fullerton demised and leased to O. S. Picher the certain tract known as the Slim Jim allotment, and the certain tract known as the Sin-tah-hah-hah allotment, for mining such minerals and ore as may be found by exploration and development for a term of years ending May 15, 1923, said Slim Jim allotment being referred to as parcel No. 6 in the 1915 contract, and parcel No. 7 in the 1920 contract, and said Sin-tah-hah-hah allotment being referred to as parcel No. 7 in the 1915 contract, and parcel No. 8 in the 1920 contract; that O. S. Picher, acting for the Picher Lead Company, took possession of said lands, and defendant and its predecessors entered into possession thereof under said leases, and have explored and operated the same for minerals, discovering and producing lead and zinc in large and paying quantities, and recognized the plaintiffs as defendant's lessors, and accounting to and paying over to plaintiffs the royalties under said leases up to the 2d day of May, 1922, but declined and refused to account to and pay over to plaintiffs the royalties accruing after May 2, 1922, up to May 15, 1923; that under the terms and provisions of said leases the defendant obligated itself to account to and pay over to the plaintiffs as royalties 12½ per cent. of the market value of all ores mined or sold; that since May 2, 1922, defendant ceased to account to the plaintiffs and make reports and refused to pay over said royalties; that between May 2, 1922, and May 15, 1923, large quantities of ore of the value of many thousands of dollars were marketed and produced; and that plaintiffs are entitled to judgment against defendant and an accounting therefor.

Plaintiffs further allege, relative to the Slim Jim and Sin-tah-hah-hah allotments, that defendant on August 1, 1922, obtained from O. K. Chandler, Superintendent of the Quapaw Indian Agency, new leases on the aforesaid Slim Jim and Sin-tah-hah-hah allotments, executed by said Chandler in behalf of the heirs of said allottees, that is, the heirs of Slim Jim, deceased, to wit, Me-hun-ka-zhe-ka Beaver, Anna Slagle, Robert Thompson, Maud Supernaw, and Mary Williams, and the heirs of Sin-tah-hah-hah, to wit, Anna Slagle, Robert Thompson, Maud Supernaw, and Mary Williams, for lead and zinc mining purposes for a term of 10 years from and after the date thereof, reserving to the Indian owners a royalty of 10 per cent. upon all ores mined and sold, and that the said allotments are now being operated and mined, and that defendant is obligated to account to and pay over to the plaintiffs 2½ per cent. of the proceeds of all ores mined and sold from said Slim Jim and Sin-tah-hah-hah allotments from and continuously after the defendant's lease became operative; that said leases were duly approved by the Secretary of the Interior on September 6, 1922.

Plaintiffs further allege that at the time of the execution of the 1920 contract, and at all times thereafter, they were the owners of certain mining rights granted under certain mining leases in and to the Slim Jim and Sin-tah-hah-hah allotments; said mining rights having been obtained in pursuance of the 1913 and 1915 contracts. Plaintiffs then make certain allegations relative to other tracts of land and other leases, but, as they are not involved in these appeals, no further reference is made to them.

Plaintiffs then pray for judgment against the defendant "(1) enforcing the contracts shown by Exhibits 2 and 3 of this petition; (2) that an accounting be had as per judgment of this court between the plaintiffs and defendant in regard to all matters set forth in this bill; (3) that defendant be ordered, adjudged, and decreed to continue to account to and pay over to the plaintiffs the royalties and sums of money provided for in the contracts shown by Exhibits 2 and 3 hereto attached during the life of said leases and renewals thereof, according to the tenor and effect of said contracts shown by Exhibits 2 and 3 of the leases, renewals, and extensions therein described; (4) that an accounting be had and the amount of defendant's indebtedness to plaintiffs adjudged by this court and judgment entered against defendant in favor of plaintiffs for all sums of money due to the plaintiffs under the facts and premises stated in this bill; and (5) that plaintiffs have all such other, further, and general relief as they may be entitled to un-

der the premises, the law, and the facts; and for all of which plaintiffs ever pray."

Defendants' answer admits the major allegations of the bill and pleads fraud and bad faith in the obtaining of secret renewals of leases, thereby breaching the contract; pleads that plaintiffs and defendant obtained new leases in the year 1921 from the Indian owners upon proper forms, which were submitted to the Secretary of the Interior for approval, and that said approval was denied, and that such action terminated the 1920 contract; pleads that the 1920 contract was illegal and void, because in contravention of the rules and regulations of the Secretary of the Interior and the acts of Congress pertaining to Quapaw allottees; pleads that the plaintiffs breached the contract and abandoned the same, by entering into competition with the defendant and endeavoring to obtain leases on the lands in question to the exclusion of the defendant and for their own benefit. Said answer also includes a counterclaim in effect asking rescission of that portion of the 1915 contract relating to parcels A, B, C, and D, and praying for a recovery of the royalties paid to the plaintiffs on said parcels under said contract. Replication was duly filed, joining issue on the counterclaim and the affirmative defenses of defendant's answer.

The cause was tried as in equity, and decree entered as hereinbefore stated. The decree recites that, on the submission the court indicated to counsel for both parties, "he was inclined to the opinion that plaintiffs were not entitled to a decree for the specific performance of the December, 1920, contract, but were entitled to an accounting for the unpaid royalties accruing during the unexpired term of their leases on the Slim Jim and Sin-tah-hah-hah allotments, and any unpaid royalties of 2½ per cent. on parcels A, B, C, and D, described in the April 8, 1915, contract, and that defendant was not entitled to any cross-relief, unless it appears that defendant had paid plaintiffs royalties after the expiration of defendant's leases on parcels A, B, C, and D, existing at the time said 1915 contract was made. * * * "

The decree then proceeds with 18 specific findings, which embody findings of fact and in some instances conclusions of law. Findings 1 to 5, inclusive, deal with the Henry Crawfish allotment, Mary Whitebird allotment, Slim Jim allotment, and Sin-tah-hah-hah allotment, and find that the defendant is the owner of approved departmental Indian leases dated August 1, 1922, on these respective allotments, and that the plaintiffs

have no interest in said leases of any kind or description, or rights to share in the gross production, royalties, or profits resulting therefrom. The sixth finding is to the effect that the plaintiffs have no interest in a lease dated 12th day of April, 1921, wherein W. I. Bingham is party of the first part, and the Eagle-Picher Lead Company is party of the second part, and covering parcel A. The seventh finding is that plaintiffs are entitled to recover from defendant, under the contract of 1915, 2½ per cent. of the gross production on parcel A between December 1, 1922, and October 13, 1923, in the sum of $4,786.28. The eighth finding is that plaintiffs are entitled to recover from defendant, under the 1915 contract, 2½ per cent. of the gross production on parcel B, between November 2, 1922, and December 6, 1924, with interest, an aggregate of $23,835.73. The ninth finding is that defendant is entitled to recover an overpayment on parcel C in the sum of $1,384.67. The tenth finding is that under the audit plaintiffs are not entitled to recover any sum on parcel D.

The eleventh and twelfth findings deal with the Slim Jim and Sin-tah-hah-hah allotments, are in favor of plaintiffs, holding that plaintiffs on October 10, 1913, were the owners of valid mining leases from the heirs of Slim Jim and Sin-tah-hah-hah, respectively, expiring as to undivided interests on different dates in June and September, 1923, and allowing recovery by plaintiffs against defendant for royalties accruing after May 2, 1922 (that being the date that the defendant ceased paying), and up to the expiration of the respective leases in 1923. The sums found due were $112,773.99 for that period on the Slim Jim allotment, and $62,542.14 on the Sin-tah-hah-hah allotment. Finding 13 is that defendant has no interest in the certain mining lease dated September 27, 1921, between Chas. A. Douthat et al. and W. W. Dobson, which is not material to these appeals. The fourteenth and fifteenth findings are to the effect that plaintiffs should forthwith make and deliver to the defendant subleases on parcels 1 and 2 (being the parcels upon which plaintiffs procured renewals of leases referred to in the 1920 contract). The sixteenth finding is that plaintiffs has no right, title, interest, or estate, or right to recover or share in the gross production, rents, royalties, or profits of any lease or lands held, owned, or controlled by the defendant herein, and sought to be recovered in the bill, except as herein set forth. The seventeenth finding is that plaintiffs have and recover from the defendant the sum of $203,938.14, less a set-

off of $1,384.67 (being the aggregate of the sums found in the previous findings), less the overpayment referred to in the ninth finding. The eighteenth finding is that defendant take nothing on its counterclaim with respect to parcels A, B, C, and D.

Plaintiffs' appeal from the foregoing decree, and the 7 assignments of error filed, present the single question whether plaintiffs are entitled to specific performance of the 1920 contract; that is, it is plaintiffs' contention that, notwithstanding the denial of the approval of the leases presented by plaintiffs and defendant when they were co-operating under the 1920 contract, and notwithstanding that plaintiffs and defendant thereafter competed as adversaries for new leases, in which competition the defendant was successful, that plaintiffs may rightfully claim a full share in defendant's victory by bringing the defendant's new leases of August 1, 1922, under the 1920 contract.

The defendant on its appeal has assigned six separate assignments of error. The first, second, and sixth assignments present the single question as to whether defendant was justified in ceasing payment of royalties under the 1915 and 1920 contracts about December 1, 1922, on parcels A, B, C, and D, notwithstanding the fact that the leases on said parcels existing when they were brought under the 1915 contract had not yet expired. Defendant's third and fourth assignments of error present the question whether defendant was justified in ceasing payment of royalties about May 2, 1922, on the Slim Jim and Sin-tah-hah-hah allotments, that being the date upon which the leases of May 2, 1912, on those allotments expired, and notwithstanding the fact that Fullerton had also procured additional leases on those allotments on June 2, 1913, purporting to run 10 years from that date, which leases the defendant claims are void, not having been approved by the Secretary of the Interior. Defendant's fifth assignment challenges merely the aggregate judgment in favor of plaintiffs, and needs no independent consideration.

Both the record and briefs on these appeals are voluminous. The questions argued have been treated and discussed with much ability and skill upon both sides. However, we are impressed with the thought that the selection, statement, and argument of the particular questions have been too much restricted in their lines of consideration. We doubt that a fair and equitable view of the controlling features of these appeals can be had through the discussion of mere selected incidents from a situation so comprehensive.

On plaintiffs' appeal the argument has been largely confined to the features of and conduct under the particular contract made in 1920. While we think that particular appeal might well be disposed of under that restricted view, we feel that there are broader considerations which should enter into its determination. On the defendant's appeal the appellant's argument, while raising the question of the validity of the two leases made by Fullerton and Picher on October 10, 1913, on the ground of public policy, is largely devoted to a discussion of the question of the validity of Fullerton's leases of June 2, 1913, on the Slim Jim and Sin-tah-hah-hah allotments, and a discussion of the effect of the alleged breach by Fullerton of the 1915 contract on account of the withholding of the assignment of leases on parcels 1 and 2. Responding, the plaintiffs' argument in effect reduces the relation of the parties to mere landlord and tenant, and, by invoking and applying the rule that a tenant may not dispute his landlord's title, seeks to avoid the effect of the possible invalidity of the June 2, 1913, leases. We do not mean to be understood as saying that counsel on both sides have not touched upon other particulars of the controversy, but that there is a broader question back of selected incidents that requires examination.

To begin with, let us see just what the relation of the parties to these appeals has been. The plaintiff, Fullerton, although having one and possibly two associates, was the active party in the dealings with Picher and his successors. As heretofore stated, Fullerton was a resident of Miami, in the mining district in question. He was a lawyer of standing and a former judge. He had had long residence in the district, and was well acquainted with the Indians. He had acted for them in the drawing of leases to others, and the record clearly warrants the inference that he was well in their confidence. He conceived the idea of obtaining leases from the Indians on his own account and for his own purposes, and, following thought with action, succeeded in doing so.

It is not impertinent at this point to say, that he obtained them at very low royalties to the Indian owners. Fullerton, however, it matters not whether from lack of means or indisposition to do so, did not develop the leases to any great extent, but—we quote from one of plaintiffs' exhibits—(a general statement written by A. C. Wallace, then attorney for the Eagle-Picher Lead Company, February 21, 1921, at a time when that company and Fullerton were co-operating in an

endeavor to get the approval of the leases by the Secretary of the Interior): "In 1912, S. C. Fullerton and Geo. W. Beck, Jr., secured lead and zinc mining leases from various Indians in the Quapaw Indian agency in Ottawa county, state of Oklahoma, under the Leasing Act of June 7, 1897, on about 2,500 acres of land in the northern part of Ottawa county, which land was raw, unbroken, prairie land without any improvement thereon, and in the past had been leased by the Indian for hay making purposes at from 50 cents to $1 an acre, and had no value for any other purpose, as the soil was very poor and underlaid with hardpan, rendering it unproductive for farm purposes. In the fall of 1913 the above named gentlemen made an effort to interest O. S. Picher of the Eagle-Picher Lead Company in this land from a mining standpoint."

The record shows that Picher became interested, and in pursuance of negotiations between him and Fullerton, the contract of October 10, 1913, was consummated. It is quite apparent that that contract was not a mere preliminary to the assignment of the particular leases then held by Fullerton or subleases under them. It is equally apparent that both parties had in mind relations and results reaching far beyond the expiration of those leases. Indeed, the burden of the contract of 1913 and all contracts thereafter executed was the broadening or extension of the terms of those leases over a period which would give time, not only to prospect, but to develop mines, build mills, and operate the mines for an indefinite period in the future. The series of contracts, as well as the conduct of the parties, indicates a purpose to join the means and the connections of Picher with the ability, activities, and influences of Fullerton, to the end that their ultimate purpose might be secure. The inducement for Picher to tie up with Fullerton in this way is best inferred from a brief portion of Fullerton's testimony on the trial. We quote a few questions and answers:

"Q. Just before you entered into this contract of October 10, 1913, with Picher, what business, if any, had you had with the Quapaw Indians upon which you had leases at that time? A. I had known them for a number of years, and been drawing leases for the other parties, and in 1912 I procured leases from them myself and was intimately acquainted with them.

"Q. Did Picher know of your acquaintance with these Indians personally at the time you had this dealing with him? A. Yes, sir; he knew it. * * *

"Q. Well, do you know whether Picher had any knowledge of your acquaintance and relationship with these Indians? A. Yes, sir, I know he had, because he discussed that with me, and told me why he wanted to enter into this contract, and wanted me to look after the renewal of these leases, because I did know them and had transacted business with them all these years."

We think it clear from the record that two considerations controlled the parties in this connection. Fullerton wanted the capital and facilities of Picher and the Picher Lead Company, with which he was then connected. Picher wanted Fullerton's influence over the Indians and his ability to obtain new leases or renewals and extensions of the existing ones. In the light of these purposes and hopes, their relationship was established and continued, with the mutations and changes effected by the succeeding contracts. True, in connection with this transaction, and as an important incident, Fullerton made subleases to Picher. But their relation was not merely that of landlord and tenant.

We think the parties fully comprehended as much. At the risk of being tedious, we quote from plaintiffs' brief: "The plaintiffs and defendant thus became jointly interested under the contract of October 10, 1913, in the renewal of these leases, and that joint interest or community interest was continued by the 1915 contract, and more firmly established by the 1920 contract. While the contracts probably did not create a partnership between the parties, their relationship was more analogous to that of joint adventurers."

We think counsel are clearly correct in their description of the legal relation effected by these contracts. The relation was clearly a joint adventure, and subject to all the legal rules, contingencies, and restrictions applicable to that relation.

We remark upon these matters at length and not without caution, for that the very purpose of such an arrangement, with an object to deal with a class of people notoriously simple and easily overreached, should challenge the most jealous scrutiny of courts of equity, when their jurisdiction is sought to be invoked to carry it into effect. We do not mean to imply that the contract of 1913, as it stood on the date of its execution, necessarily contravened public policy or shocked conscience, merely because the leases described therein reserved only a 5 per cent. royalty to the Indian owners. We think the relationship of the parties, as it existed in 1921, should be judged, not by that contract alone, but by the succeeding contracts, and

the conduct and evinced purposes of the parties under them.

Just why the 1915 contract was made, and the 1913 contract superseded, is left largely to inference by the record. True, there were mutual considerations for that contract, the most important of which was the inclusion of the parcels A, B, C, and D by Picher. Just why this important contribution was made is left somewhat in doubt. We must consider, however, that at that time the territory had become better proven. Something had occurred with respect to the Picher Lead Company. Shortly after the execution of the 1915 contract, the Eagle-Picher Lead Company was organized under the laws of Illinois, and became a successor of the Picher Lead Company as to all of the mining leases in question, and that company was about to and did invest very large sums of money in the development of these leases. We are strongly inclined to the inference that the purpose of this contract was to tie Fullerton and Fullerton's influence over the Indians more securely to the enterprise.

Following the execution of the 1915 contract, the Eagle-Picher Lead Company began extensive operations on the lands described therein. Mines were opened, mills were built, and large quantities of ore taken from the lands during the succeeding years. As heretofore stated, about $200,000 in royalties were paid to Fullerton and his associates. The Eagle-Picher Lead Company were taking an equal sum, independent of what may have been otherwise received as profits of operation. Portions of these lands were subleased by the Eagle-Picher Lead Company to other operators on a royalty basis of 17½ per cent. As the existing leases neared expiration, and early in 1921, the plaintiffs and defendant began active co-operations to obtain new leases from the Indians, and on February 10, 1921, new leases were obtained, reserving to the Indian owners 5 per cent. royalty until the expiration of existing leases, and thereafter 7½ per cent. royalty, with the exception of one parcel, where a lease was obtained upon the original basis of 5 per cent. These were the leases which were submitted to the Secretary of the Interior for approval and approval denied.

The Commissioner of Indian Affairs at the time was of the opinion that the Indian landowners should receive 15 per cent., or double that named in the proposed leases. Following this rejection, the "Swift" letter was written in behalf of the Eagle-Picher Lead Company, and thereupon the Eagle-Picher Lead Company submitted its own application for leases in pursuance of proposals decided upon by the Interior Department. At this point all co-operation between the parties ceased. Fullerton and his associates protested, and resisted the applications of the defendant for leases, and presented applications on their own behalf, Fullerton, Dobson, and Beck. In some of the applications Fullerton offered 10 per cent. to the Indian landowners, in others 12½ per cent. to the Indian landowners, and in one instance more. We quote from the letter of the plaintiffs submitting their proposal:

"As an evidence of good faith upon the part of these applicants and protestants the Secretary of the Interior is hereby advised that, in the event that 'the proposal' and conditions effecting the letting of the lands in question be removed, and leases executed to bidders qualified to operate or sublease the lands in question and financially able to carry out their contracts, said contracts to be upon the forms commonly used in the Oklahoma lead and zinc district in which these mines are located, that these applicants will pay to the Superintendent of the Quapaw Agency, or other person designated by the Secretary of the Interior, for the use and benefit of the Indian owners of the Mary Whitebird allotment, for a lease on such form, a royalty of 15 per cent."

Now, a little earlier in the negotiations, when the parties were co-operating, they had obtained from the Indian heirs of Mary Whitebird and submitted for approval a lease on this very allotment reserving to the Indian owners a royalty of 7½ per cent. The original lease on this allotment had been obtained at a royalty of 5 per cent., and the Eagle-Picher Lead Company thereafter subleased the same to an independent operator at 17½ per cent. Now, while it is true that the Eagle-Picher Lead Company subsequently succeeded in obtaining the approval of the Secretary of the Interior to leases on these lands, reserving to the Indian owners royalties of only 10 per cent., the reason for which does not very satisfactorily appear in the record, yet in the light of all of these circumstances it is difficult to avoid the conclusion that one of the cardinal purposes of this joint adventure was to exploit the Indian owners of these lands by the aid of Fullerton's influence and his intimate contact and acquaintance with them, gotten in part while acting for others in his professional capacity. If such a conclusion is warranted, then it would seem to be a case for the application of the equitable maxim that he who comes into equity must come with clean hands.

We think, however, upon other grounds, the same result must necessarily obtain. We will consider briefly the plaintiffs' appeal. Were plaintiffs entitled to a decree for specific performance of the 1920 contract? The lower court was of opinion that, when the Secretary of the Interior denied approval of the leases obtained from the Indians and presented by plaintiffs and defendant co-operating, and when plaintiffs, in co-operation with Beck and the defendant, indulged in antagonistic competition for new leases, each party to the exclusion of the other, there was an abandonment by the parties of the 1920 contract. We think the opinion and conclusion of the District Court in this respect was entirely correct.

With the approval of May 30, 1921, by the Secretary of the Interior of the decision of the Commissioner of Indian Affairs, transmitted on May 20th, there was no further rational hope of continuing under the provisions of that contract. The basis of royalty to the Indian owners contemplated by that contract was so low that applying the general provisions of the contract to any leases which the Secretary of the Interior was likely to approve would leave so small a margin for a division that there was no apparent disposition at any time by either of the parties to further co-operate under it. This was a joint adventure, and the scheme contemplated by the adventure we think became impracticable by the decision of the Secretary of the Interior. We think that both parties recognized this, and that they chose to become adversaries; each endeavoring to the exclusion of the other to obtain leases on the lands in question. This we think was a legal abandonment of the contract, and it follows, independently of the broader question heretofore discussed, that on the plaintiffs' appeal the case should be affirmed.

On the defendants' appeal we think that the discussion may be properly confined to three questions: First, the question of estoppel; second, the question of the validity of the June 2, 1913, leases on the Slim Jim and Sin-tah-hah-hah allotments; and, third, whether the 1915 contract should continue to be enforced as to parcels A, B, C, and D. We will discuss these questions in the order stated.

We do not question or attempt to minimize the force of the long and well settled doctrine that a tenant is estopped to question the title of his landlord. But general statements of that doctrine are often misleading. The estoppel is directed to the title of the landlord under which the tenant enters; that is, the title at the time of the creation of the tenancy. 35 C. J. p. 1243, § 595, and many cases cited. A material change, such as the termination of the landlord's title under which the tenant entered, terminates the estoppel. 35 C. J. p. 1243, § 596, and many cases cited; Bettison v. Budd, 17 Ark. 546, 65 Am. Dec. 442, and note; McAusland v. Pundt, 1 Neb. 211, 93 Am. Dec. 358, and note; Johnson v. Riddle, 240 U. S. 467, 36 S. Ct. 393, 60 L. Ed. 752. In the last case cited the Supreme Court clearly holds that a tenant is not estopped to prove that the title of his landlord has expired; and, if a material change in the landlord's title terminates the estoppel, it would seem that the expiration of a lease which had been undisputed and relied upon, and which the parties by their conduct had acknowledged as the basic dominant title, would remove the estoppel as applied to an additional lease, the validity of which is doubtful, and which is disputed by the original lessor, or an authority representing such original lessor, under whom the landlord claims. In the light of these propositions we will examine the title under which the defendant entered. The opinion of Edwin S. Booth, Solicitor for the Department of the Interior, dated July 24, 1922, sets out a list of leases held by Fullerton on these tracts, and expresses his opinion upon their validity. We quote from the opinion.

"With these facts in mind, we first come to consider the leases covering the allotment of Sin-tah-hah-hah, as shown by the abstract referred to. Three leases, dated, respectively, June 1, 1901, March 17, 1906, and September ——, 1907, each for the term of 10 years (abstract, pp. 8, 14 and 115), have long since expired, and hence may be dismissed from further consideration here, although serious legal objection may exist to recognizing them as complete valid leases. Four leases of more immediate concern may be summarized thus:

"(1) Mes-kah-tun-kah tract, to S. C. Fullerton, dated May 2, 1912, term 10 years, expired May 2, 1922 (abstract, p. 17).

"(2) Mes-kah-tun-kah tract, to S. C. Fullerton, dated June 2, 1913, term 10 years, expires June 2, 1923 (abstract, p. 24).

"(3) W. H. Trapp, as guardian of Mary Thompson, to S. C. Fullerton, dated September 3, 1914, term ending June 2, 1923 (abstract, p. 28).

"(4) W. H. Trapp, as guardian of Robert Thompson, to S. C. Fullerton, dated De-

cember 28, 1914, term ending September 25, 1923 (abstract, p. 32).

"It will be observed that lease numbered (2) above overlaps lease No. 1, and is therefore invalid under the rule laid down by the Supreme Court in United States v. Noble, 237 U. S. 74, 81, 35 S. Ct. 532, 59 L. Ed. 844. Assuming lease No. 1 to be otherwise valid, it expired on May 2, 1922, since which date there remains no complete valid outstanding lease covering all of the undivided interest in and to the allotment of Sin-tah-hah-hah; one tenant in common being unable to bind the interests of his co-tenants. Archer on Oil and Gas, pp. 660, 661, and cases there cited. Five separate leases, all dated June 8, 1917, covering an undivided one-fourth interest in the five 40-acre tracts comprising this allotment, all executed by Maud Supernaw, as heir of Robert Thompson, in favor of one H. E. Lindas, appear in the abstract on pages 38, 39, 40, 41, and 42. These, however, all come within the rule of overlapping leases under the Noble Case, supra, and may be disregarded.

"As to the allotment of Slim Jim, three leases, dated, respectively, May 28, 1901, March 17, 1906, and April 26, 1911, have previously expired (abstract, pp. 5, 13, and 16). These require no further consideration here. Six leases shown by the abstract remain to be considered:

"(1) Me-hunk-a-zhe-ka Beaver and Mes-kah-tun-kah Tract, to S. C. Fullerton, dated May 2, 1912, term 10 years, expired May 2, 1922 (abstract, p. 18).

"(2) Maud Thompson Supernaw and Mary Thompson, to S. C. Fullerton, dated August 22, 1912, term 10 years (abstract, p. 25).

"(3) Me-hunk-a-zhe-ka Beaver and Mes-kah-tun-ka Tract, to S. C. Fullerton, dated June 2, 1913, term 10 years (abstract, p. 25).

"(4) W. H. Trapp, as guardian of Mary Thompson, to S. C. Fullerton, dated September 3, 1914, term ending June 2, 1923 (abstract, p. 28).

"(5) Me-hunk-a-zhe-ka Beaver, Mes-kah-tun-kah Tract, and Maud Supernaw, to S. C. Fullerton, dated September 7, 1914, term 10 years (abstract, p. 29).

"(6) W. H. Trapp, as guardian of Robert Thompson, to S. C. Fullerton, dated December 28, 1914, term ending September 25, 1923 (abstract, p. 32).

"It will be observed that lease No. 3 covering this allotment overlaps lease No. 1 and is therefore invalid; further, that lease No. 1 expired by its own terms on May 2, 1922. Mary Thompson, one of the parties lessor under lease No. 2 was a minor on August 22, 1912, the date of this lease, and, of course, execution as to her interests should have been had by guardian with approval of the proper court. This defect was apparently remedied by lease No. 4. Lease No. 5 is invalid, because it overlaps leases Nos. 1 and 3 in so far as the interests of Me-hunk-a-zhe-ka Beaver and Mes-kah-tun-ka Tract are concerned, and lease No. 2 in so far as the interests of Maud Supernaw are concerned.

"With these facts at hand, I am of the opinion that at this date there is no outstanding complete valid lease covering the entire interests of all the heirs in and to the allotment of either Sin-tah-hah-hah or of Slim Jim, deceased."

Now, it will be observed that, according to the opinion of the Solicitor of the Interior Department, it was the leases of May 2, 1912, that constituted the basis of title vested in Fullerton, at the time he subleased to Picher in connection with their joint adventure. Indeed, this seems to have been the idea of the parties themselves, prior to their falling out with one another on the rejection of the February 10, 1921, leases. The February 10, 1921, leases were the ones negotiated with the Indians under the 1920 contract, and for the purpose of carrying out the object of the joint adventure. Those leases were for terms of 10 years, commencing May 2, 1922, the date of the expiration of the May 2, 1912, leases. The June 2, 1913, leases upon the Slim Jim and Sin-tah-hah-hah allotments were entirely ignored at that time, and only after the rejection of those leases did plaintiffs shift their position to the 1913 leases. All proceedings before the Interior Department in 1921 seem to have been upon the assumption that the basic leases would expire May 2, 1922; otherwise, there would seem to have been no reason for consideration of the subject of new leases at that time. Neither the government nor the Indians in those proceedings disputed the validity of the May 2, 1912, leases, whatever their real legal status may have been. We think, therefore, that with the expiration of the May 2, 1912, leases, and particularly in view of the conduct of the parties and the attitude of the Interior Department, and the approval of the new leases by the Secretary of the Interior, there was such a material change in the title under which the defendant and its predecessors entered as to remove any estoppel which might otherwise be applicable, assuming, but not deciding, that the doctrine of estoppel between tenant and landlord under consider-

ation would apply to a lease which was merely one of the incidents to a broader and more comprehensive joint adventure between the parties.

■ This brings us to a consideration of the question of the validity of the June 2, 1913, leases. It will be observed that the May 2, 1912, leases were by Me-hunk-zhe-ka Beaver and Mes-hah-tun-kah Tract to S. C. Fullerton and ran for a period of 10 years. It will be further observed that the June 2, 1913, leases were by the same parties to the same party, and also ran for a term of 10 years. The leases were substantially identical, except as to their dates. Independent of the question of restriction, what then would be the effect of the second leases? The lessee already had the term up to May 2, 1922, and it would seem that their only effect would be to grant an additional term, commencing with the expiration of the May 2, 1912, leases, and running to the date of the expiration of the 1913 leases. Now, with the lessee already in possession under the 1912 leases, this additional term was not a term in possession, but a term in futuro, as was the case in United States v. Noble, 237 U. S. 74, 35 S. Ct. 532, 59 L. Ed. 844. In that case it was held, construing the Acts of Congress of March 2, 1895, c. 188, 28 Stat. 876, 907, and of June 10, 1896, c. 398, 29 Stat. 321, 331, and of June 7, 1897, c. 3, 30 Stat. 62, 72, that Quapaw Indians could not execute valid leases in futuro, but only leases in possession. We think that, under the decision in United States v. Noble, supra, the Solicitor of the Interior Department was correct in his opinion, and that the leases of June 2, 1913, were void as overlapping leases.

■ This disposes of the defendant's assignments of error, with the exception of assignments 1, 2, and 6, argued together on the defendant's brief. It will be recalled that parcels A, B, C, and D came into the arrangement under the 1915 contract. What the controlling consideration was for their inclusion at that time is left much in doubt by the record, as well as by the contract itself. We are inclined to the opinion, however, as heretofore indicated, that it was a concession by the defendant to the plaintiffs for renewed and more satisfactory conditions of their joint adventure. It being now apparent that the mutual considerations for that arrangement have almost completely failed, we think, wholly independent of our initial conclusion relative to the character of the joint adventure, that it would violate fundamental principles of equity to continue the enforcement of the 1915 contract relative to those particu-

lar parcels. We are of the same opinion with respect to the claims of the defendant on parcels 1 and 2.

Finally, we are of opinion that, both for the reasons and upon the conclusion reached with respect to the character and purpose of the joint adventure, and upon the alternative hypothesis upon which the particular assignments of errors have been discussed, the District Court should have dismissed the plaintiffs' bill as well as the defendant's counterclaim. It follows that on the plaintiffs' appeal the case should be affirmed, and on the defendant's appeal the case should be reversed, with directions to the District Court to dismiss the plaintiffs' bill and the defendant's counterclaim; and it is so ordered.

Affirmed on the plaintiffs' appeal.

Reversed on the defendant's appeal.