## UNITED STATES OF AMERICA *v.* NOBLE.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 127. Argued March 1, 2, 1915.—Decided April 5, 1915.

The Quapaw Indians are still under National tutelage; the guardianship of the United States continues notwithstanding the citizenship conferred upon allottees.

Where Congress has imposed restrictions upon alienation of an allotment, the United States has capacity to sue for the purpose of setting aside conveyances or contracts transferring such restrictions.

Restrictions under the act of March 2, 1895, being for a specified period, were absolute and bound the land for that period whether in the hands of the allottee or his heirs except as to leasing it for the specified terms permitted by the act of June 10, 1896, or by the supplemental act of June 7, 1897; neither of those acts gave the allottee or his heirs any power to dispose of his or their interest in the lands subject to the lease or any part of it.

Assignments of interest in rents and royalties which pertained to the reversion of the land of 1896 and 1897 are invalid.

Rents and royalties already accrued from lands are personal property, but those to accrue are a part of the estate, remaining in the lessor.

"Overlapping leases" of Indian allotments are abnormal and the practice of making them facilitates abuses in dealing with ignorant and inexperienced Indians.

The rule that a general power to lease for not exceeding a specified period, without saying either in possession or on reversion, only authorizes a lease in possession and not *in futuro*, applies to the power given allottee Indians by the acts of 1896 and 1897 and leases made for the full period subject to an existing and partly expired lease for the same number of years are unauthorized and void.

197 Fed. Rep. 292, reversed.

THE facts are stated in the opinion.

*Mr. Assistant Attorney General Knaebel,* with whom *Mr. S. W. William* was on the brief, for the United States.

*Mr. A. S. Thompson, Jr.,* and *Mr. V. E. Thompson,* with whom *Mr. S. C. Fullerton* and *Mr. Preston Davis* were on the brief, for appellees.

MR. JUSTICE HUGHES delivered the opinion of the court.

The Government brings this appeal to review a decree of the Circuit Court of Appeals, which affirmed a decree dismissing, upon demurrer, its suit as against the appellees. 197 Fed. Rep. 292.

The suit was instituted against the appellees, and others, to set aside certain mining leases of an Indian allotment, and assignments of rents and royalties, upon the ground that they were procured in fraud of the allottee, and were in violation of the restriction against alienation imposed by Congress. The land in question had been allotted to Charley Quapaw Blackhawk, a member of the Quapaw tribe of Indians, under the act of March 2, 1895, c. 188, 28 Stat. 876, 907. Patent was issued on September 26, 1896. The act of 1895 contained the following restriction:

"*Provided* That said allotments shall be inalienable for a period of twenty-five years from and after the date of said patents."

By the act of June 10, 1896, c. 398, 29 Stat. 321, 331, Congress authorized the allottees of lands, within the limits of the Quapaw Agency, 'to lease the same for a term not exceeding three years for farming purposes, or five years for mining or business purposes.' A further authorization—the one here involved—was made by the act of June 7, 1897, c. 3, 30 Stat. 62, 72, which was as follows:

"That the allottees of land within the limits of the Quapaw Agency, Indian Territory, are hereby authorized to lease their lands, or any part thereof, for a term not exceeding three years, for farming or grazing purposes, or ten years for mining or business purposes. And said allottees and their lessees and tenants shall have the right to employ such assistants, laborers, and help from time to time as they may deem necessary: *Provided*, That whenever it shall be made to appear to the Secretary of the Interior that, by reason of age or disability, any such allottee cannot improve or manage his allotment properly and with benefit to himself, the same may be leased, in the discretion of the Secretary, upon such terms and conditions as shall be prescribed by him. All acts and parts of acts inconsistent with this are hereby repealed."

The bill alleges that the allottee made the following mining leases of the allotted lands, and assignments of rents and royalties, to wit:

(1) Lease, dated January 11, 1902, to A. W. Abrams, for ten years from date, in consideration of the sum of $10, and a royalty of five per cent. of the market value of all minerals mined or removed (except gas, for which there was to be paid $40 per annum for each paying well), with the proviso that there should be a minimum rental of $20 a year in case the royalties did not exceed that amount. On August 13, 1903, the lease was assigned by Abrams to the Iowa & Oklahoma Mining Company.

(2) Lease, dated August 24, 1903, to A. W. Abrams,

for ten years from date, in consideration of $18, and of royalties which were the same as in first lease save that the minimum rental was $21 a year. This lease was assigned on November 2, 1904, to the Iowa & Oklahoma Mining Company.

(3) Lease, dated March 25, 1905, to L. C. Jones, and the appellee A. J. Thompson, for ten years from date, for $10 and five per cent. royalty. It was stated that the lease was subject to the first lease above mentioned. The interest of Jones was assigned to the appellee, A. J. Thompson, on July 31, 1905.

(4) Lease, dated April 4, 1905, to the Iowa & Oklahoma Mining Company, for ten years from date, for $25, with the same royalties as in the first lease above mentioned and with minimum rental of $21 a year.

(5) Lease, dated May 12, 1906, to the same company, for ten years from date and with the same consideration as that of the lease described in paragraph (4). It was provided that 'this lease and all former leases above referred to shall run concurrently,'—the lessee being entitled to elect under which of the leases it would operate.

(6) Lease, dated July 28, 1906, to the same company, for the term of twenty years from date for $21, with the same royalties and minimum rental as those reserved in the preceding lease described in paragraph (5):

(7) Grant or assignment, dated August 16, 1902, to the appellee, Charles F. Noble, of all the allottee's 'right, title and interest in and to the royalty, rent and proceeds' of the mining lease dated January 11, 1902, made to Abrams, described in paragraph (1). It was further agreed, by said instrument, that if the Abrams' lease 'should be surrendered and become void the within lease should hold good for the period of ten years.' On the same date, Noble assigned 'a one-half interest in the above-described instrument' to John M. Cooper.

(8) Assignment, dated February 21, 1906, to the ap-

pellees, A. S. Thompson and V. E. Thompson. It recited
a judgment, in a suit against Noble and Cooper, decreeing
that the allottee was the owner 'of two and one-half
percentage of the entire product mined from said land
and sold on or subsequent to the 31st day of January,
1906, and up to and including the 11th day of January,
1912,' and assigned to the above-mentioned appellees
'an undivided one-half interest in and to the said judgment
for royalties,' that is, 'one and one-quarter per cent. of
the whole product on said lands' during the period covered
by the first lease to Abrams, described in paragraph (1).

The bill further averred that the allottee, Charles
Quapaw Blackhawk, was a full blood Indian, born in
1835, unable 'to read, or write, or understand intelli-
gently the English language,' an 'ignorant and unedu-
cated child of nature,' old and infirm, and wholly in-
capacitated for the transaction of business; that the lands
were worth approximately $100,000; that on January 11,
1902, when the first lease was made, the lands had not been
prospected and the value for mining purposes was un-
certain, and that the consideration mentioned in that
lease was 'equitable and sufficient'; that immediately
thereafter, the lessee (the defendant, Abrams) caused
the lands to be drilled and prospected and found 'large,
valuable and paying bodies of lead and zinc ore'; that for
the five years preceding the filing of the bill (July, 1909),
there had been 'a number of concentrating plants or so-
called ore mills located upon the said land, and in opera-
tion,' and that 'the actual value of the output thereof,
when in operation, was in excess of $50,000 a year; that
in 1905, and before, the defendant Abrams, through
his assignee, the Iowa & Oklahoma Mining Company,
had sublet to other mining companies portions of the
lands in consideration of a royalty of fifteen per cent. of
the market value of the ores mined, which was a reason-
able royalty; and that the transactions narrated in the

bill (apart from the first lease to Abrams) were 'inequitable and unconscionable' and a fraud upon the allottee.

The validity of the first lease was conceded by the Government, but it was alleged that all the other leases and the assignments were in violation of the express restriction subject to which the allotment was made.

Demurrers were filed by all the defendants. The Circuit Court held that the Government was not entitled to impeach the transactions upon the ground of fraud, but could challenge the validity of the several instruments as being in violation of the statutory restriction. It is not important here to consider the disposition made of the leases described in paragraphs (2), (4), (5), and (6), as these are not involved in this appeal. It is sufficient to say that the demurrers of Abrams and the Iowa & Oklahoma Mining Company were overruled, and that those of the appellees were sustained. *United States* v. *Abrams*, 181 Fed. Rep. 847. As to the latter, the bill was dismissed, and the decree to that effect was affirmed by the Circuit Court of Appeals, as already stated.

We have, then, the question of the validity of the lease and assignments described in paragraphs (3), (7); and (8).

The Quapaws are still under national tutelage. The Government maintains an agency and, pursuant to the treaty of May 13, 1833, 7 Stat. 424, an annual appropriation is made for education and other assistance (37 Stat. 530). In 1893, the Quapaw National Council made provision for allotments in severalty which were to be subject to the action of Congress and in the act of ratification of 1895 Congress imposed the restriction upon alienation which has been quoted. The guardianship of the United States continues, notwithstanding the citizenship conferred upon the allottees (*United States* v. *Celestine*, 215 U. S. 278, 291; *Tiger* v. *Western Investment Co.*, 221 U. S. 286, 315, 316; *Hallowell* v. *United States*, 221 U. S. 317, 324; *United States* v. *Sandoval*, 231 U. S.

28, 48); and, where Congress has imposed restrictions upon the alienation of an allotment, the United States has capacity to sue for the purpose of setting aside conveyances or contracts by which these restrictions have been transgressed. *Heckman* v. *United States*, 224 U. S. 413; *Mullen* v. *United States*, 224 U. S. 448, 451; *Bowling* v. *United States*, 233 U. S. 528, 534.

1. We may first consider the assignments of rents and royalties. Under his patent, the allottee took an estate in fee, subject to the limitation that the land should be 'inalienable for the period of twenty-five years' from date. This restriction bound the land for the time stated, whether in the hands of the allottee or his heirs. *Bowling* v. *United States, supra.* It put it beyond the power of him, or of them, to alienate the land, or any interest therein, in any manner except as permitted by the acts of 1896 and 1897. See *Taylor* v. *Parker,* 235 U. S. 42. The comprehensiveness of the restriction was modified only by the power to lease; and while the allottee could make leases, as provided in these acts, they gave him no power to dispose of his interest in the land subject to the lease, or of any part of it. The rents and royalties were profit issuing out of the land. When they accrued, they became personal property; but rents and royalties to accrue were a part of the estate remaining in the lessor. As such, they would pass to his heirs, and not to his personal representatives. 1 Washburn on Real Property, *337; *Wright* v. *Williams,* 5 Cow. 499. It is true that the owner of the reversion, when unrestricted in his right to convey, may sever the rent and grant it separately, but this is by virtue of his freedom to deal with the estate in the land. 2 Bl. Com. *176.

It necessarily follows that the allottee in the present case having no power to convey his estate in the land could not pass title to that part of it which consisted of the rents and royalties. It is said that the leases contemplated the payment of sums of money, equal to the agreed per-

centáge of the market value of the minerals and thus that the assignment was of these moneys; but the fact that rent is to be paid in money does not make it any the less a profit issuing out of the land. The further argument is made that the power to lease should be construed as implying the power to dispose òf the rents to accrue. This is wholly untenable. The one is in no way involved in the other; the complete exercise of the authority which the statute confers would still leave the rents and royalties, to accrue, as part of the estate remaining in the lessor. It was the intent of Congress that the allottees during the period of restriction should be secure in their actual enjoyment of their interest in the land. *Heckman* v. *United States, supra.* The restriction was removed only to the extent specified; otherwise, the prohibition against alienation remained absolute.

The first assignment of royalties, as above described [paragraph (7)], was made on August 16, 1902, of rents to accrue under the first lease, of January 11, 1902, which was to run for ten years. The second assignment made in January, 1906 [paragraph (8)] was, in substance of 'one and one-quarter per cent. of the whole product on said lands' until January 11, 1912. Both were assignments of interests which pertained to the reversion, and both must be held to be invalid under the statute.

2. The lease, here in controversy, was made on March 25, 1905, for ten years from date [paragraph (3)]. The property was already subject to a lease, concededly valid, for ten years from January 11, 1902. The lease under which the appellee claims is what is known as an "overlapping lease.' It is not necessary to describe transactions of this character, for they are abundantly illustrated in the record which shows that this allottee made six leases of the same rights in less than five years, each for ten years from date with the exception of the last which was for twenty years, and all reserving substantially the same rents and

royalties which were reserved in the first lease at a time when the property had not been prospected. The practice, to say the least, is an abnormal one, and it requires no extended discussion to show that it would facilitate abuses in dealing with ignorant and inexperienced Indians. It is urged, however, that the manner of dealing with the Indians, in gradually releasing them from guardianship and preparing them for complete independence, is for Congress to determine; that Congress has in this case authorized a lease for ten years; that this was a lease for ten years, and no longer, and hence was within the authority; and that, however wise it might have been to prohibit 'overlapping leases,' Congress did not so provide.

We are of the opinion that this is too short a view. The question is as to the scope of the authority given by Congress; that is, whether it did not extend simply to leases in possession, and should be taken not to include 'leases in reversion.' The allottee, as we have seen, is under an absolute restriction with respect to his reversion for a period of twenty-five years from the date of his patent. In the light of this restriction, and of the governmental policy which induced it, there is sound reason for construing the power as not authorizing anything more than a lease in possession, as well understood in the law. At common law, as the Government points out, it was the established doctrine, that a tenant for life with a general power to make leases could make only leases in possession, and not leases in reversion or *in futuro*. He was not authorized by such a power to make a lease to commence 'after the determination of a lease in being.' Such a lease was deemed to be 'reversionary.' *Countess of Sussex* v. *Wroth*, Cro. Eliz. 5; *Shecomb* v. *Hawkins*, Cro. Jac. 318; Yelv. 222; *Winter* v. *Loveday*, Comyn, 37; Sugden on Powers, p. 749; 4 Greenleaf's Cruise's Digest, 165, 166; *Taussig* v. *Reel*, 134 Missouri, 530, 544–547; Woodfall on Landlord and Tenant (19th ed.), 239, 244, 245. "A general

power to lease for a certain number of years without saying either in possession or reversion, only authorizes a lease in possession and not *in futuro*. Such a power receives the same construction as a power to make leases in possession. What is expressed in the one is understood in the other." *Shaw* v. *Summers*, 3 Moore, C. P. 196. This is not to say that an agreement for a new lease, at a fair rental, made shortly before the expiration of an existing lease, would not be sustained in equity. See *Dowell* v. *Dew*, 1 You. & Coll. 345.

We are unable to see that the allottee under the power in question has any better position. The protection accorded by Congress, through the restriction upon the alienation of the allottee's estate—modified only by the power to lease as specified—was not less complete because the limitation was not in the interest of a remainderman, but was for the benefit of the allottee himself as a ward of the Nation. The act of 1897 gives him authority 'to lease' for a term not exceeding the stated limit. Taking the words in their natural sense, they authorize leases in possession and nothing more. The language does not compel the recognition of leases which are to take effect in possession many years after their execution, if, indeed, it could be assumed that they were not intended to be concurrent. Such leases certainly violate the spirit of the statute, and according to the analogies of the law they violate its letter.

If, on the other hand, the lease be deemed to be a concurrent lease, that is, to be effective from its date, then it could only have that effect, being subject to the existing lease, as a grant or assignment of the reversion while the existing lease continued. Accordingly, it would entitle the lessee, as assignee of part of the reversion, to the rent reserved in the previous lease. Bac. Abr., *tit.*, *Leases*, (N); *Harmer* v. *Bean*, 3 C. & K. 307   Woodfall on Landlord and Tenant (19th ed.), 245, 246. But every convey-

ance of the reversion, or of any interest therein, was clearly prohibited by the restriction.

From every point of view, we must conclude that a lease for ten years, made in 1905, subject to an existing lease for ten years, of the same property, which by its terms was to run until 1912, was unauthorized and void.

As the United States was entitled to maintain the suit to cancel these instruments as transgressing the statutory restriction, it is unnecessary to consider the question whether, in the absence of such a violation, the Government would have capacity to sue to redress alleged frauds committed against allottees.

The decree is reversed and the cause is remanded for further proceedings in conformity with this opinion.

*It is so ordered.*

MR. JUSTICE MCREYNOLDS took no part in the consideration and decision of this case.