Gladys **STRAY CALF** et al., **Plaintiffs-Appellants,**

v.

**SCOTT LAND & LIVESTOCK CO.** et al., **Defendants-Appellees.**

**No. 75–1946.**

United States Court of Appeals, Ninth Circuit.

Dec. 30, 1976.

Rehearing and Rehearing En Banc Denied March 9, 1977.

Daniel H. Israel (argued), of Native American Rights Fund, Billings, Mont., for plaintiffs-appellants.

Cale Crowley (argued), of Crowley, Kilbourne, Haughey, Hanson & Gallagher, Billings, Mont., for defendants-appellees.

Before KOELSCH and WALLACE, Circuit Judges, and BURNS,[*] District Judge.

BURNS, District Judge:

Plaintiffs-Appellants are adult Crow Indians, each of whom is the beneficial owner of trust land in the Crow Indian Reservation in southeastern Montana. Defendants-Appellees are non-Indian ranchers who lease the trust land from the plaintiffs for farming and grazing. The plaintiffs seek a declaration that the defendants' leasing practices violate statutory and regulatory provisions which limit the duration of leases of Crow trust lands. The plaintiffs also seek injunctive relief and damages.

After the parties stipulated that there were no issues of fact, except on the issue of damages, the district court granted the defendants' motion for summary judgment and denied the plaintiffs' motion for partial summary judgment. 391 F.Supp. 433

(D.Mont.1975). The plaintiffs appeal. We affirm.

The Crow Indian Reservation, created by the Treaty of Fort Laramie of 1868, 15 Stat. 649, comprises about 2,000,000 acres. In the Crow Allotment Act of 1920, Act of June 4, 1920, ch. 224, 41 Stat. 751, Congress allotted to individual Crow Indians the tribal land suitable for agriculture and grazing. The Act established a commission to divide the Crow tribe into two classes—competent and incompetent. Some competent Crows received patents in fee for their allotments. All other competent Crows, and all minor and incompetent Crows, were issued trust patents under which the United States retained legal title to the allotments and the Crow allottees acquired beneficial title.

In 1926, Congress amended the Crow Allotment Act of 1920. Act of May 26, 1926, ch. 403, 44 Stat. 658. That Act authorized competent Crows to lease their trust land for grazing and agriculture without supervision by the Secretary of the Interior; the Secretary retained sole leasing authority over the trust land of incompetent and minor Crows.[1] The 1926 Act further provided that leases of trust lands could not exceed five years.[2]

Congress had restricted lease terms in other Indian allotment statutes before the 1926 amendment to the Crow Allotment Act. Lessees tried to avoid these restrictions through various practices, including so-called overlapping leases. Under that practice, the Indian lessor and his lessee would execute a new lease for the maximum term long before the old lease expired, without cancelling the old lease. In 1915, the Supreme Court invalidated overlapping leases in *United States v. Noble*, 237 U.S. 74, 35 S.Ct. 532, 59 L.Ed. 844.

In 1927, Congress statutorily restricted overlapping leases on the Crow Indian Res-

[*] Honorable James M. Burns, United States District Judge, District of Oregon, sitting by designation.

1. More than 900,000 acres of the Crow Indian Reservation are leased each year by competent Crows, without the Secretary's supervision.

2. Congress subsequently authorized certain irrigated land to be leased for up to ten years.

ervation by providing that no lease could be renewed, and no lands could be released, prior to a certain period before termination of the lease.[3] Act of March 3, 1927, ch. 325, 44 Stat. 1365. Congress deleted this 1927 language in 1948 when the Crow Allotment Act was amended to expand the class of competent Crow Indians. Act of March 15, 1948, ch. 120, 62 Stat. 80.

After 1948, so-called *in futuro* leasing became a common practice on the Crow Indian Reservation. Under that practice, the Crow-lessor and the rancher-lessee would execute an initial lease for the maximum five-year term, and the rancher would prepay the rent for the full five years. About a year after execution of that lease, the Crow and the rancher would execute a new document which cancelled the existing lease at some future date (usually about a year) and created a new five-year lease to begin at that future date. Upon execution of that document, the rancher would pay the Crow the rent for the added term.

In 1962, the Solicitor of the Department of the Interior declared that these *in futuro* leases violated the five-year restriction on leasing in the Crow Allotment Act, as amended. The rancher-lessees thereafter adopted the current practice. Under this practice, the rancher still prepays the entire five years of rent to the Crow-lessor. Each year the rancher and the Crow cancel the existing five-year lease, and, in a separate but simultaneously-signed document, execute a new five-year lease. The rancher then pays the Crow the rent for the added term.

The plaintiffs (Crow-lessors) contend that this leasing practice violates the five-year restriction imposed by both the Crow Allotment Act of 1920, as amended in 1926, and a federal regulation interpreting that statute. 25 C.F.R. § 131.15. The defendants (rancher-lessees) argue that they are complying with the law because each lease is for only five years.

The plaintiffs acknowledge that the leases are for only five years. They contend, however, that the law requires that there land be totally free of encumbrances at least once every five years and that the current practice precludes that periodic freedom. They say that Congress intended to protect the Crows from their own inexperience in business by limiting the duration of any disadvantageous lease to just five years. The current practice, the plaintiffs contend, has the effect of binding them to disadvantageous leases perpetually.

The plaintiffs admit that they are legally free to let the current leases expire and then to negotiate new leases. But, they contend, financial and economic pressures prevent them from doing that. When a rancher-lessee prepays rent for a five-year lease, the Crow-lessor has to wait five years to get additional income from his land. The plaintiffs contend that because the Crow-lessors are very poor and need annual income from their land they submit to the annual cancellation—re-leasing ritual with the rancher-lessee in order to receive the prepaid rental for the added term.

The rancher-lessee, the plaintiffs contend, has the Crow-lessor's land tied up for five years, so the Crow has to deal with the current rancher, who can and does insist on favorable terms. The Crow is thereby bound by successive unfavorable leases because he cannot afford to let five years run without income. Furthermore, he is unable to terminate the lease in less than five years because he cannot afford to repay the prepaid rent for the unexpired term of the lease.

The plaintiffs want the current leasing practice declared illegal and the existing leases voided.

We need not decide whether the current practice is illegal. Even if we adopted the plaintiffs' rule that their trust lands must be free of all encumbrances at least once every five years, the plaintiffs have failed to prove on the record before us that the current leasing practice violates that rule.

In previous cases involving restrictions on lease terms for Indian trust lands, the legal-

---

**3.** This period was twelve months for grazing land and eighteen months for farm land.

ity of the lease practices was capable of being determined without reference to financial and economic considerations. Here, the plaintiffs' challenge to the current leasing practice on the Crow Indian Reservation can succeed only if the plaintiffs prove that financial and economic pressures compel them to re-lease their land to the defendants. The plaintiffs have not, however, proven this crucial point. In this record, there is no evidence on plaintiffs' financial situation, little evidence on the amount of the annual rental payments, and no evidence on the plaintiffs' inability to avoid or mitigate the consequences of the leasing practice. On the other hand, it is admitted that the Crow tribe has had since 1962 a $1,000,000 fund from which competent Crows can borrow money (at 4%) secured by a mortgage on their trust land. This fund might help the plaintiffs avoid or mitigate the pressures which the plaintiffs allege are created by the defendants' leasing practice.

Perhaps the plaintiffs could prevail on their theory in a future case if they make a sufficient factual showing. We express no opinion on that. We merely hold here that the plaintiffs have failed to prove all of the elements of their case. We therefore affirm the district court's grant of summary judgment against the plaintiffs.

AFFIRMED.

WALLACE, Circuit Judge, dissenting:

I respectfully dissent. I conclude that the leases in question violate the Crow Allotment Act, as amended, and should be declared void.

The lessees, Scott Land & Livestock Co., et al., urge that the 1948 amendment to the Crow Allotment Act, which deleted an earlier provision prohibiting the renewal of leases of grazing lands prior to one year before their termination,[1] opened the way for the practice now before us. The 1948 amendment, it is said, must be construed consistently with congressional intent gradually to emancipate the Crow Indians from government interference in managing their allotted property.

I am of the opinion that the Act must also be read in the light of the special relationship of the United States to the Indians. The nature of this relationship was aptly first described by Chief Justice Marshall in *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed.2d 25 (1831), as "perhaps, unlike that of any other two people in existence." *Id.* at 16. He observed that Indian tribes, rather than being foreign states, "may, more correctly, perhaps, be denominated domestic dependent nations" "in a state of pupilage" and concluded that "[t]heir relation to the United States resembles that of a ward to his guardian." *Id.* at 17.

This guardian relationship, and the concomitant duty of protection it implies, has been repeatedly acknowledged by Congress and recognized by the courts. As stated by the Supreme Court:

> From their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress and by this court, whenever the question has arisen.

*United States v. Kagama*, 118 U.S. 375, 384, 6 S.Ct. 1109, 30 L.Ed. 228 (1886). *Accord, Sunderland v. United States*, 266 U.S. 226, 233–34, 45 S.Ct. 64, 69 L.Ed. 259 (1924).

The plan of Congress gradually to emancipate the Indians so that they gain greater responsibility over their own affairs is not in conflict with the government's guardian-

---

1. The deleted part of the statute provided: And provided further, That no lease of grazing lands now in force or hereinafter made shall be renewed, or any of the lands embraced within the same be re-leased, prior to one year before the termination of such lease: And provided further, That no lease of farming lands now in force or hereinafter made shall be renewed, or any of the lands embraced within the same be re-leased, prior to eighteen months before the termination of such lease.
Act of March 3, 1927, ch. 325, 44 Stat. 1365.

ship role. It is, on the contrary, an extension of it. The ultimate aim of guardianship as the term is used here, should be that the wards become, in time, self-sufficient. Legislation meant to further Congress' plan to emancipate the Indians must therefore be construed in light of the guardian relationship and, necessarily, be limited by it.

I agree that the overall purpose of the 1948 amendment to the Crow Allotment Act was to increase the responsibility of the Crow people over their lands. Legislative history is instructive on the primary means chosen to implement this purpose. The Crow Allotment Act of 1920 [2] established a commission to divide the Crow people into two classes, competent and incompetent, with minors belonging to the latter class. No provision was made to reclassify minors when they attained their majority. A later amendment [3] provided that competent Crows could lease their allotted grazing lands for five-year terms without federal supervision. [4] As time passed, however, and minors reached their majority, a smaller and smaller percentage of adult Crows was classified competent. [5] Congress reversed this trend through the Act of March 3, 1931, [6] authorizing the Secretary to change the classification of any Crow Indian under the Act of June 4, 1920, from incompetent to competent on the recommendation of a committee appointed for that purpose. However, the 1931 legislation failed to define properly the Secretary's administrative responsibility for proper land use and range management in connection with the leasing of Crow lands and it was not until passage of clarifying legislation in 1948, the amendment now under scrutiny, that the classification of Indians began pursuant to the 1931 Act. It was upon this impending reclassification that congressional attention was primarily focused during enactment of the 1948 amendment. *See* H.R.Rep.No.940, 80th Cong., 1st Sess. (1947); S.Rep.No.386, 80th Cong., 1st Sess. (1947).

The 1948 amendment added a provision that any Crow Indian classified as competent should have the full responsibility of obtaining compliance with the terms of any lease made and deleted a provision in an earlier amendment [7] prohibiting the renewal of leases of grazing lands prior to one year before their termination and the renewal of leases of farming lands prior to eighteen months before termination. The practice now in use is that each lease is made for five years but is annually cancelled and renewed for five years. It is argued that, since each five-year lease is within the statutory maximum term and since no prohibition against cancellation of an existing lease and execution of a new lease now appears in the Act as amended, the practice is valid.

It is clear, however, that Congress did not intend, in passing the 1948 amendment, to remove all limitations imposed upon the Crows' ability to lease their lands. The provision restricting the grazing land leases to five-year terms remained untouched. There is nothing in the legislative history of the Act to show congressional intent to emasculate this provision or to reverse case law construing such restrictions. Indeed, the legislative history is barren as to why the Congress deleted the prohibition forbidding re-leasing until one year before the end of a five-year term. We are left to guess whether the Congress meant that re-leasing was to be valid during the first four years or forbidden even in the last year. That there was a general attempt to increase the responsibility of Crows over their

2. Act of June 4, 1920, ch. 224, 41 Stat. 759.

3. Act of May 26, 1926, ch. 403, 44 Stat. 658.

4. Irrigable lands under the Big Horn Canal could be leased for ten years.

5. In 1947 the Senate Committee on Public Lands reported that of the 575 Crow Indians classified as competent under the 1920 Act, only 318 were still alive; of 2,470 Indians on the Crow Reservation, 2,152 were classified as incompetent. S.Rep.No.368, 80th Cong., 1st Sess. 2 (1947).

6. Act of March 3, 1931, ch. 414, 46 Stat. 1495.

7. See note 1, *supra.*

land is not a convincing argument for validating all re-leasing practices when considered in light of the guardianship role of the government. Thus, I find that the focal point for deciding the validity of the leasing practice before us is not the absence of the earlier provision in the Act as amended, but the presence of the five-year lease limitation.

It has been frequently recognized that the intent of Congress in placing limitations on the length of leases of trust lands was to shield the Indians from the sharp practices of non-Indians who would despoil them of their property and to protect the Indians from their own lack of business experience. *Smith v. McCullough*, 270 U.S. 456, 464–65, 46 S.Ct. 338, 70 L.Ed. 682 (1926); *Sunderland v. United States, supra*, 266 U.S. at 233–34, 45 S.Ct. 64; *United States v. Haddock*, 21 F.2d 165, 167–68 (8th Cir. 1927). Commenting on the reason for lease-length restrictions, the Supreme Court in *Smith v. McCullough* said:

> In adopting the restrictions Congress was not imposing restraints on a class of persons who were *sui juris*, but on Indians who were being conducted from a state of dependent wardship to one of full emancipation and needed to be safeguarded against their own improvidence during the period of transition. The purpose of the restrictions was to give the needed protection, and they should be construed in keeping with that purpose.

270 U.S. at 464–65, 46 S.Ct. at 341.

The restriction imposed by the Crow Allotment Act is that the term of leases of grazing lands not exceed five years. Under the leasing practice in question, the parties enter into an arrangement whereby the Indian lessors lease their lands for the maximum term, five years. The lessees prepay the rent for the full five years. Thereafter, every year, the Indian lessors and lessees perform a ritual at the office of the lessees whereby the five-year leases are cancelled and new five-year leases, prepared by the non-Indian lessees, are signed. Another year's rental is paid the Indians.

It is argued that the practice is valid because each lease is only five years long, thus within the letter of the Act's restriction, that the Indian is in legal possession of his land when he makes each new lease and that he is always free simply to let the lease run to its natural termination without renewing it. I think this argument ignores the economic realities of the situation.

The Indians rely upon *United States v. Noble*, 237 U.S. 74, 35 S.Ct. 522, 59 L.Ed. 844 (1915), where the Supreme Court considered the validity of a leasing practice under a statute, similar to the Crow Allotment Act, which governed leasing of allotted lands to the Quapaw Indians. That statute provided that allottees were authorized to lease their restricted lands for a term not exceeding ten years for mining or business purposes. The lessors would lease the land for ten years but one to four years later would sign a new instrument leasing the land for an additional ten years. The practice created a series of overlapping leases. The Court held that the statute permitted only leases made in possession and that the instruments attempting to lease what was only a reversionary interest were void.

The lessees rely upon *United States v. Abrams*, 194 F. 82 (8th Cir. 1912), where the court held valid, under the same statute construed in *Noble*, an outright cancellation of an existing mining lease and the execution of a new mining lease for ten years.

Neither case is controlling on the facts presented here. These leases are not a reversionary interest as in *Noble*. Each new lease is made while the Indian is in legal possession of his land as was the case in *Abrams*. But absent in *Abrams*, and present here, is the practice of prepayment of the original five-year lease and a provision in the cancellation document that nothing therein shall be deemed a release of any claim against the lessor for advances made or rentals prepaid.

Though the courts in *Noble* and *Abrams* reached opposite conclusions, the common thread that runs through these cases and

those that follow [8] is the view, implicit or explicit, that Congress intended the Indians to have a free and unencumbered choice, at least once at the end of each statutory period, to lease their lands to whomever they choose and upon the best terms they can find.

I think the leasing practice here, whereby rentals are prepaid for five years and the obligations of the lessors arising from such prepayments survive annual cancellation of the leases, interferes with the Indians' right to lease their lands free and unencumbered at least once very five years.

Were the parties businessmen dealing at arm's length, the practice of prepaying rentals might be thought to benefit the lessors who thereby gain the use of the funds in advance. Here, however, the lessors are Indians whom Congress sought specifically to protect from their own lack of experience in business matters. The lessees are wealthy ranchers. It is not difficult to see how the prepayment practice would work to lock the Indians into a continual cancellation and re-lease procedure. Once the prepaid funds are received and spent, the Indians are faced annually with the alternative of accepting one more year's rental in exchange for another five-year renewal or going four years without additional income from the land in order to let the lease run out. It has not been shown that the Indians are in an economic position to choose the latter or to cancel the lease and repay the rental sums plus damages to which the lessees may be entitled.

It may be argued that the Indians should be more circumspect in their use of the prepaid funds, retaining them in the event that they should wish to let the leases run out. But this argument misses the mark. It was precisely the Indians' improvidence in money matters, their inexperience and naivete that spurred Congress to adopt the lease-length restrictions.[9]

The five-year lease-length restriction was designed as a fail-safe mechanism to insure that mistakes made by the Indians in leasing their lands would be limited both in consequence and in duration. I find that the leasing practice here, whereby the lessees pay in advance the entire five-year rental, preys on the inexperience and poverty of the Indians and thwarts congressional intent embodied in the Act that the Indians make an unencumbered choice in leasing their property at least once every five years.

It may well be that in a given fact situation, the intent of the statute is being carried out by a particular lease cancellation re-lease practice. It cannot be said that all Indians are forced economically into the lease straitjacket. In fact, it is argued that the Indians have not demonstrated any economic coercion. I feel no initial showing on their part is required. In view of the fact that the purpose of the five-year restriction is to protect the Indians from their own improvidence and from the avarice of non-Indians, I feel the burden of showing that there is no economic coercion is more properly placed on the lessees.

I would reverse the judgment and remand for specific findings on the question of economic coercion.

8. *See United States v. Labbitt*, 334 F.Supp. 665 (D.Mont.1971); *Harley v. McCasland*, 162 Okl. 117, 19 P.2d 356 (1933).

9. Lessors call our attention to a recent report of the United States Department of the Interior which indicates that 918,412 acres of land are leased by competent Crows while 415,467 acres of land are leased by the Secretary of the Interior acting through the Superintendent of the Crow Agency. According to the lessors, this report found that the average annual rental for the competent leases was $.76 per acre per year while the average annual rental for the leases supervised by the Superintendent of the Crow Agency was $1.65 per acre per year. *Effects of Proposed Changes in Crow Competent Leasing Practices*, prepared for the Crow Indian Tribe by the Planning Support Group of the Bureau of Indian Affairs (February 22, 1973).