*Roat v. C.I.R.*, 847 F.2d 1379, 1381 (9th Cir. 1988). Consequently, the Agents have no duty to file a return for Morelli, and the Court lacks mandamus jurisdiction over this claim as well.

### B. Morelli's Challenge to the Adequacy of the Notice of Intent Is Barred by the Anti–Injunction Act

Morelli's final argument is that the Notice of Intent, dated January 18, 1993, fails to comply with the substantive requirements of 26 U.S.C. § 6331(d)(4).[4] We do not reach the merits of this claim because Morelli's action to seek review of the Notice is barred by the Anti–Injunction Act, 26 U.S.C. § 7421. See *Randell v. United States*, 64 F.3d 101, 106 (2nd Cir.1995). The purpose of § 7421 is to protect the government's need to assess and collect taxes as expeditiously as possible with a minimum of pre-enforcement judicial interference, and to require that the taxpayer's legal rights be determined in a suit for refund.[5] See *Randell*, 64 F.3d at 106. Section 7421 has been broadly construed to include not only assessment and collection, but also "activities which are intended to or may culminate in the assessment or collection of taxes." *Linn v. Chivatero*, 714 F.2d 1278, 1282 (5th Cir.1983). See also *Weiner v. I.R.S.*, 986 F.2d 12, 13 (2nd Cir.1993) (taxpayer suit seeking apology or explanation of errors that caused improper levy barred by 26 U.S.C. § 7421); *Bianco v. I.R.S.*, 1994 WL 538020 at *2 (S.D.N.Y. 1994) (claim regarding the state of taxpayer's records and requests for corrections barred

by 26 U.S.C. § 7421). Therefore, the Anti–Injunction Act divests this Court of jurisdiction to hear Morelli's claim for preenforcement review of the Notices he received under 26 U.S.C. § 6331.

### CONCLUSION

For the reasons stated, Defendants' motion to dismiss is granted.

The clerk shall enter judgment.

**SO ORDERED.**

**SHELL OIL COMPANY, Plaintiff,**

v.

**Bruce BABBITT and The U.S. Department of the Interior, Defendants.**

**Civil Action No. 95–492 MMS.**

United States District Court, D. Delaware.

March 13, 1996.

---

Samuel A. Nolan, Robert W. Whetzel and Frederick L. Cottrell, III of Richards, Layton & Finger, Wilmington, Delaware (L. Joe Leggette and Jackson & Kelly, Washington, DC, of counsel), for plaintiff.

Patricia Hannigan, Assistant United States Attorney, Department of Justice, Wilmington, Delaware; Lois Schiffer, Assistant Attorney General, Department of Justice, Washington, DC; Michael J. Robinson, United States Department of Natural Resources Division, Washington, DC (Peter Schaumberg and Sarah L. Inderbitzin, United States Department of the Interior, Washington, DC (of counsel), for defendants.

Gregg E. Wilson, Deputy Attorney General, Department of Justice, Wilmington, Delaware Lee Ellen Helfrich and Dina R. Lassow of Lobel, Novins & Lamont, Washington, DC (of counsel), for Controller of the State of California (amicus).

*OPINION*

MURRAY M. SCHWARTZ, Senior
District Judge.

## I. INTRODUCTION

Plaintiff Shell Oil Company ("Shell" or "Shell Oil") has filed suit against defendants Bruce Babbitt, as Secretary of the Department of the Interior, and the Department of the Interior (collectively "the Government" or "defendants"), seeking review of a decision issued by the Department of the Interior's Minerals Management Service ("MMS") dated April 3, 1990. Docket Item ("D.I.") 1 at ¶ 1. The MMS order requires Shell's disclosure of documents involving Shell's purchase and resale of certain crude oil. D.I. 8, Exhibit ("Exh.") 1. The oil in question was produced in California on land leased by Shell Western Exploration & Production Inc., ("Shell Exploration"), a Shell-owned subsidiary. *Id.;* D.I. 8 at Exh. 2. Shell has requested declaratory and injunctive relief that the defendants are not entitled to the documents at issue, that the MMS order be vacated, and that Shell is entitled to relief on the merits of its dispute with the Government. D.I. 1 at ¶ 9.

Defendants have moved under 28 U.S.C. § 1406(a) [1] and Fed.R.Civ.P. 12(b)(3) [2] to dismiss or transfer this action on the ground that venue in the District of Delaware is improper. D.I. 6. Judicial review of this matter is undertaken pursuant to the Administrative Procedure Act, 5 U.S.C. § 702; jurisdiction is founded upon 28 U.S.C. § 1331. For the reasons stated below, the Court will deny defendants' motion to dismiss or transfer for improper venue.

## II. FACTUAL BACKGROUND

Although the motion pending before the Court centers on the federal venue statute, recital of a few background facts, essentially undisputed, is necessary to provide some context for disposition of the venue issue. Plaintiff Shell Oil is a corporation incorporated under the laws of the State of Delaware; its principal place of business is Houston, Texas. D.I. 1, ¶ 2. During the period from January 1, 1985 through December 31, 1988, Shell Exploration, an entity not a party to this action, produced crude oil from land in California leased from the United States. D.I. 8, Exh. 2. As lessee, Shell Exploration was the designated payor of royalties to the United States on the oil under the Mineral Lands Act. *See* 30 U.S.C. § 226(c) (lessee of federal land subject to lease for oil production must pay value or in-kind royalty).

The royalties paid to the federal government by Shell Exploration were based on a specific percentage, *i.e.,* 12½%, of the "value of the production" of the crude oil removed from the land and sold under the leases. *See id.* ("A lease under this subsection shall be conditioned upon the payment of a royalty at a rate of 12.5 percent in amount or value of the production removed or sold from the lease."). This rate of "value of production" is also set forth in regulations promulgated by the Secretary of the Interior for royalty valuations on oil produced under federal leases. *See* 30 U.S.C. § 189 (Secretary of the Interior is authorized to accomplish the purposes of the Mineral Leasing Act). Under these regulations, the "value of production" can never be less than the "gross proceeds" accruing to Shell Exploration from the disposition of the oil, *see* 30 C.F.R. § 206.103 (1987), 30 C.F.R. §§ 206.102(h) (1988); "gross proceeds" are equal to the total consideration accruing to Shell Exploration for the disposition of the oil produced under the leases, *see* 30 C.F.R. § 206.101 (1988).

After producing the crude oil, Shell Exploration sold it to its corporate parent, Shell Oil, pursuant to a purchase and sales agreement dated January 1, 1985. D.I. 8, Exh. 2. The purchase and sales agreement between Shell Exploration and Shell Oil permitted

---

**1.** Section 1406(a) provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

**2.** Under Fed.R.Civ.P. 12(b)(3), a party may move for dismissal by asserting a defense of improper venue.

Shell Oil to establish a market price for the crude oil purchased based upon the average prices posted by its competitors for the purchase of oil from producers. D.I. 1, ¶ 8b; D.I. 7 at 6–7. Shell subsequently sold at least some of the oil to unrelated third parties. D.I. 8, Exh. 2.

By authority delegated under the Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C. § 1735, the Controller's Office of the State of California audited Shell Exploration's royalty payments under the federal leases for the period January 1, 1985 through December 31, 1988. D.I. 8 at 2. The California Controller's office reported its findings to the Department of the Interior's MMS. That report concluded that the initial sale of oil from the oil producer, Shell Exploration, to the marketer, Shell Oil, was a non-arm's length transfer between two corporate affiliates. D.I. 7, Exh. 4. Because the federal royalty valuation occurred at the point of this inter-affiliate transfer, the Controller's office recommended that it would be necessary to look to a subsequent arm's length sale of the oil to unrelated third parties to establish the "gross proceeds" for royalty purposes. *Id.*

On April 3, 1990, the MMS issued an order stating that because the inter-affiliate sale was not viewed as an arm's-length transaction, the measure of the "value of production" should be based on the subsequent sale of that oil by Shell to third parties. D.I. 8, Exh. 1. The order required that the third party arm's-length purchase price would then be compared with the non-arm's-length contract prices to ensure proper valuation and thus proper payment of royalties to the United States. *Id.* Shell Oil was directed to provide access to its documents evidencing its arm's-length sales of the oil produced under the federal leases. *Id.*

Shell Oil appealed the Order to the Director of the MMS. The appeal was denied on March 1, 1991. D.I. 8, Exh. 2. Shell then sought review of the Director's decision before the Interior Board of Land Appeals, which, on August 1, 1994, reversed the Director's Decision and held that the MMS could not seek production of the records in question. D.I. 8, Exh. 3. Subsequently, the

MMS petitioned for reconsideration, and on May 11, 1995, the Interior Board of Land Appeals reversed itself and affirmed the Director's decision ordering Shell Oil's production of documents. D.I. 8, Exh. 4.

After its petition for reconsideration was denied, Shell Oil filed its complaint in this action, alleging that the Department of the Interior's decision and "its refusal to reconsider that decision are arbitrary and capricious, violate the Department's regulations, exceed the Department's power under the Federal Oil and Gas Royalty Management Act ( [30] U.S.C. § 1701 *et seq.*), and are not in accordance with law in violation of the Administrative Procedure Act (5 U.S.C. § 706)." D.I. 1 at ¶ 9. Shell Oil seeks to deny access to the records relating to its disposition of the crude oil, arguing that the transaction between Shell Exploration and Shell Oil constituted the point of royalty computation. D.I. 1 at ¶ 8f. Shell Oil maintains that the Department of the Interior should accept the terms of the agreement between Shell Exploration and itself as the appropriate measure of valuation for federal royalty purposes.

In filing the instant action, Shell Oil has also alleged that, pursuant to 28 U.S.C. § 1391(e)(3), venue is proper in the District of Delaware. Shell avers that because it is a Delaware corporation, and no real property is involved in the action, venue is proper in Delaware. Defendants argue that real property is involved in this action, citing the Government's "reserved royalty interest" in the California oil leases as its real property interest. According to the Government, because real property *is* involved, venue lies outside of Delaware, either where the defendants reside, section 1391(a)(1), or where the events that gave rise to this action took place, section 1391(a)(2).

### III. DISCUSSION

The narrow issue before the Court is whether real property is involved in this action within the meaning of the federal venue statute. That statute provides:

A civil action in which a defendant is an officer or employee of the United States or

any agency thereof acting in his official capacity . . ., may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action. . . .

28 U.S.C. § 1391(e). Several courts, including this Court, have previously touched on this question with respect to oil and gas leases; a survey of case law authority as well as the legislative history of the statute is instructive.

The legislative intent behind section 1391(e) has been set forth previously by this Court in *Santa Fe Int'l Corp. v. Watt*, 580 F.Supp. 27, 29 (D.Del.1984):

> Congress added section 1391(e) to the venue statute in 1962 in order to broaden the venue of civil actions which could previously have been brought only in the District of Columbia. . . . [It] intended to relieve plaintiffs of the burden of litigating far from their residences, to relieve the courts in the District of Columbia of some of their case load, and to take advantage of the expertise district judges acquire in the problems peculiar to their areas.

*Id.* at 29 (citations omitted). In expanding the availability of forums, however, Congress considered, then rejected, a bill placing venue in any judicial district simply "where plaintiff resides." *Id.* at 30. The United States Department of Justice, speaking through then Deputy Attorney General Byron R. White, recommended that this broad residency criterion

> be changed to grant venue 'in any judicial district in which the cause of action arose, or in which any property involved in the action is situated.' The principal demand for this proposed legislation comes from those who wish to seek review of decisions relating to public lands, such as the awarding of oil and gas leases, consideration of land patent applications and the granting of grazing rights or other interests in the public domain.

Letter from Byron R. White to Senator James O. Eastland (Feb. 28, 1962), *reprinted in* 1962 U.S.C.C.A.N. 2784, 2788, 2789. Congress expressed a similar interest in having local judges resolve disputes affecting local land:

> [D]isregarding considerations of convenience, broadening of the venue provisions of title 28 to permit these actions to be brought locally is desirable from the standpoint of efficient judicial administration. Frequently, these proceedings involve problems which are recurrent but peculiar to certain areas, such as water rights, grazing land permits, and mineral rights. These are problems with which judges in those areas are familiar and which they can handle expeditiously and intelligently.

Sen.Rep. No. 1992, 87th Cong., 2d Sess., 1962 U.S.C.C.A.N. at 2786.

Mindful of this legislative intent, courts have found that where an application for an oil or gas lease is directly at the heart of a lawsuit, real property is involved in the action for purposes of the federal venue statute. *See e.g., Ferguson v. Lieurance*, 565 F.Supp. 1013 (D.Nev.1983); *Landis v. Watt*, 510 F.Supp. 178 (D.Idaho 1981). In construing this subsection of the venue statute, courts have also uniformly held that if real property is only "peripherally" or "marginally" involved, a plaintiff retains its right to sue in the judicial district in which it resides.

For example, in *Santa Fe*, 580 F.Supp. 27, this Court was confronted with an action challenging the validity of a Department of Interior order involving 380 oil and gas leases. The administrative order denied the *Santa Fe* plaintiffs, corporations "ultimately owned" by a Kuwaiti entity, the right to continue to participate in the leases which were located throughout the United States. *Id.* at 28. Acknowledging that the foreign plaintiffs' underlying objective was the prevention of impairment of its interests in the multiple leaseholds, the Court also recognized that adjudication of the plaintiffs' rights hinged on the alien qualification provision of the Mineral Lands Leasing Act. *Id.* at 30. This determination required only expertise in administrative law and perhaps foreign law. *Id.* Thus, disposition of the

principal issue did not involve questions of a peculiarly local nature or knowledge of state or federal mineral rights law and as such, was "divorced from any substantial concern relating to the leasing of particular local lands." *Id.* at 31. Accordingly, under those circumstances, this Court held that real property was only tangentially involved.

The court in *Ashley v. Andrus,* 474 F.Supp. 495 (E.D.Wis.1979), employed similar reasoning. In that case, plaintiff's decedent had submitted numerous applications into a lottery system in which oil and gas leases were to be awarded. *Id.* at 496. After he filed the applications, the decedent died; subsequently, the lottery chose his application to "win" an oil leasehold situated in North Dakota, leased through the Department of the Interior. *Id.* The decedent's spouse paid the first year's rental on the parcel as required by federal law. *Id.* Upon discovery of the decedent's death, however, the Bureau of Land Management determined that the decedent's application did not qualify to win the lottery because he had died prior to the date on which the card was drawn. The government therefore denied plaintiff, as surviving spouse and personal representative of the decedent's estate, entitlement to the leasehold. *Id.*

Plaintiff sued in the Eastern District of Wisconsin, the judicial district of her residency. The government moved to dismiss the action for improper venue, arguing that real property was involved in the action and that venue properly lay in the district where the leasehold was located. The court, however, noted that in plaintiff's complaint, she merely sought a declaration that the Department of the Interior had incorrectly interpreted the appropriate statutes and regulations governing the lottery. *Id.* The court held that the central issue in the case involved statutory and regulatory interpretation, not the underlying property. *Id.* at 497. Although real estate was involved, it was only in fact peripherally involved; there was nothing that needed to be done to accomplish the plaintiff's objectives which could not be as readily done in Wisconsin as in North Dakota. *Id.*

■ Ultimately, when deciding whether a case relating to an oil and gas lease involves real property, the question distills down to one of degree, and each case must be analyzed under its unique factual idiosyncrasies. In the case *sub judice,* Shell Oil argues that this case principally involves a challenge to an administrative order to produce documents. The Secretary of the Interior has deemed these documents critical for the evaluation of the accuracy of royalty payments made under federal oil and gas leases by Shell Exploration, a Shell subsidiary that is not a party to this lawsuit. Shell contends that like the *Santa Fe* and *Ashley* plaintiffs, it challenges an administrative interpretation of federal law—law that applies uniformly to all federal oil and gas lessees, and that the suit does not involve questions of a peculiarly local nature, requiring knowledge of state or federal mineral rights law.

On the other hand, the Government asserts that but for the oil leases, the facts giving rise to this case would have never materialized. The Government contends that section 1391(e) was designed to prevent plaintiffs from bringing suit against the United States in locations distant from and unrelated to real property, specifically, mineral leases which encompass the oil leases involved here. The pivotal issue here, it argues, is its "reserved royalty interest," which it would have the Court find as an interest in real property. Thus, consideration of the nature of the Government's interest in the royalties paid by Shell Exploration is critical.

■ A royalty interest is commonly defined as a right to a fractional share of the oil produced from the leased land. Richard W. Hemingway, *The Law of Oil and Gas,* § 2.5 at 58 (3d ed.1991). Royalties for oil have long been created by lease of land or mineral fee interest for oil purposes. 3A W.L. Summers, *The Law of Oil and Gas* § 572 at 5 (1958). Three distinct kinds of legal interests in the land and the oil contained therein are merged in the lessor: 1) the lessor's interest in the surface; 2) a reversionary interest in the oil remaining in the ground, contingent upon the termination of the lease; and 3) the right to receive royalties and/or rent under the lease. *Id.* It is this last type of interest that is at issue in this case, *i.e.,* the Government's interest in its royalty valu-

ation of oil produced by Shell Exploration under the California leases.

The Government contends that the ultimate dispute in this case is "how to value the royalty interest and has it been adequately accounted for." Transcript of Hearing, D.I. 15 at 84. Stated differently, it also maintains that "what is being valued is the royalty interest itself ..." *Id.* at 85. Finally, the argument continues, that because it is the royalty interest reserved by the federal lessor in the lease that is being valued, the nature of the Government's interest is a real property interest.

■■■ The Government is partially correct in its assertion that it reserves a real property interest in the oil royalties generated under the federal leases. It is hornbook law that the lessor's interest in royalties under an oil lease may be both accrued and unaccrued. *See* Summers, § 572 at 9; Hemingway, § 2.5 at 59. Traditionally, courts have viewed unaccrued royalties, *i.e.*, royalties to be paid from future production under a mineral lease, as real property interests retained by the lessor. *United States v. Noble*, 237 U.S. 74, 80, 35 S.Ct. 532, 534–35, 59 L.Ed. 844 (1915).[3] However, royalties which have accrued from the production and severance of oil from the land have been generally regarded by courts as personal property. *See id.*; Hemingway, § 2.5 at 59 (collecting cases); 1 Howard R. Williams and Charles J. Meyers, *Oil and Gas Law* § 214 (Matthew Bender 1995) (collecting cases).

Both the federal statutory and regulatory framework are consistent with the above common law tradition. Congress has chosen to structure the scheme of royalty payments based on the value of the oil produced and severed from the land. *See* 30 U.S.C. § 226(c); 30 C.F.R. §§ 202.100. Thus, federal law requires valuation of the oil produced from the Shell Exploration leases as ongoing royalty payments. Valuation of the accrued oil, which is personalty, not realty, lies at the core of the dispute between the parties.

In addition, the Government also concedes that Shell's obligation to produce the documents "as a purchaser of gas, rather than a lessee, derives from [the Federal Oil and Gas Management Act] and implementing regulations," and "substantively, the case involves interpretation of that statute and those rules." D.I. 11 at 5. The Government is correct: this is not a case that hinges on the location of the leases, or that involves the right, title, or interest in real property. *See Jewish War Veterans of the United States v. United States*, 695 F.Supp. 1, 2 (D.D.C.1987) (quoting *Natural Resources Defense Council v. Tennessee Valley Authority*, 340 F.Supp. 400, 406 (S.D.N.Y.1971) (*rev'd on other grounds*, 459 F.2d 255 (2d Cir.1972)). Rather, at issue is Shell Oil's responsibility, under the Federal Oil and Gas Royalty Management Act, 30 U.S.C. § 1713(a), to disclose information the Secretary deems necessary for royalty valuation under a federal oil lease. Section 1713 provides:

> A lessee, operator, or *other person* directly involved in developing, producing, transporting, purchasing, or selling oil or gas subject to this chapter through the point of first sale or the point of royalty computation, whichever is later, shall establish and maintain any records, make any reports, and provide information that the Secretary may, by rule, reasonably require for the purposes of implementing this chapter or determining compliance with rules or orders under this chapter. Upon the request of any officer or employee duly designated by the Secretary or any State or Indian Tribe conducting an audit or investigation pursuant to this chapter, the appropriate *records, reports, or information which may be required by this section shall be made available for inspection* and duplication by such officer or employee, State, or Indian Tribe.

*Id.* (emphasis added). Pursuant to this statute, under Department of Interior regulation 30 C.F.R. § 212.51,

---

**3.** Both parties have urged,·and the Court agrees, that the characterization of the property interest comprising the Government's royalty interest is governed by federal common law. *See Wallis v. Pan Amer. Petroleum Corp.*, 384 U.S. 63, 71, 86

S.Ct. 1301, 1305–06, 16 L.Ed.2d 369 (1966) (transfer of property under oil leases by the United States is governed by federal law.); *see also* D.I. 8 at 12, D.I. 15 at 80.

Each lessee, operator, revenue payor, or *other person* shall make and retain accurate and complete records necessary to demonstrate that payments of ... royalties ... are in compliance with lease terms, regulations, and orders.

*Id.* (emphasis added). The actual leasehold interest by Shell Exploration is not at issue here; no familiarity with the locale of the underlying leases is necessary to an informed decision in this case. Essentially, this matter involves judicial review of an administrative decision compelling disclosure relating to the valuation of royalties of severed oil under certain federal leases.

### CONCLUSION

Admittedly, "[g]ravity being what it is, the vast bulk of human activities take place on the face of the earth. Consequently, almost any dispute over public or private decisions will in some way 'involve real property,' taken literally." *Natural Resources Defense Council,* 340 F.Supp at 406. However, because the central issue in this case involves review of an administrative order to produce documents relating to the valuation of personal property, the Court holds that real property is not involved in this action for purposes of 28 U.S.C. § 1391(e). Accordingly, because Shell Oil is incorporated in Delaware, venue is proper in this judicial district under 28 U.S.C. § 1391(e)(3).